**Gerald M. HOCKING,**
**Plaintiff-Appellant,**

v.

**Maylee DUBOIS and Vitousek & Dick Realtors, Inc., a Hawaii corporation, Defendants-Appellees.**

No. 85–1932.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 13, 1986.

Decided Feb. 10, 1988.

Patrick C. Clary, Las Vegas, Nev., for plaintiff-appellant.

John P. Foley and John C. Morrell, Las Vegas, Nev., for defendants-appellees.

Before GOODWIN, HUG and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

■ This is an action for fraud brought under the federal securities laws against a real estate agent and the broker that employed her. Appellant Hocking based federal jurisdiction on the claim that the real estate agent offered a "security" within the meaning of the federal securities laws. He also alleged pendent state causes of action for fraud. The district court entered summary judgment, concluding that it lacked subject matter jurisdiction because no security was involved. On appeal, the central issue is whether the real estate agent's alleged conduct, if true, constituted the offering of an "investment contract" within the meaning of the federal securities laws. There is no dispute that the agent, Dubois, transmitted an offer to sell a condominium unit from the owner to the plaintiff. There is, however, a genuine issue of fact whether the offer included an option to participate in a rental pool operated by the developer of the condominium complex.[1] The ques-

---

1. In her answer to Hocking's Third Amended Complaint, Dubois denies that the offer included an option to participate in a rental pool arrangement. The district court did not make a factual finding on this issue because it reasoned that the optional nature of the rental pool precluded the finding of a security. As discussed fully below, that reasoning was incorrect.

For convenience only and because hereafter we deal only with the legal issues involved, throughout the rest of our opinion we treat as an established fact plaintiff's claim that the offer included an option to participate in a rental pool arrangement. We do not actually make any such factual determination here. For purposes of summary judgment, we need only note that evidence in the record, when viewed in the light most favorable to Hocking, raises a genuine issue of material fact as to whether the offer included such an option. For example, Hocking stated that he had been informed of the availability of the rental pool arrangement by Dubois, and that he would not have purchased the condominium without the option. Further, within two weeks of purchasing the condominium, Hocking entered into the rental pool arrangement. Despite this evidence, the resolution of the factual issue must await a trial on the merits or a motion for summary judgment filed by Hocking.

tion is whether that fact is a material one. We hold that it is, and that the offer of a condominium with an option to participate in a rental pool arrangement constitutes the offer of an investment contract under the securities laws. Accordingly, we reverse the grant of summary judgment.

## I.

Gerald Hocking visited Hawaii and became interested in buying a condominium there as an investment. When he returned to his home in Las Vegas, he made this known to a co-worker whose wife, Maylee Dubois, was a licensed real estate agent in Hawaii. She was employed by Vitousek & Dick Realtors, Inc., a Hawaiian real estate brokerage firm. A meeting was arranged between Hocking and Dubois. Subsequently, Dubois agreed to help Hocking find a suitable unit.

Dubois found a condominium unit owned by Tovik and Yaacov Liberman that was for sale. The unit was located in a resort complex developed by Aetna Life Insurance Company ("Aetna"). As a part of the original development, Aetna had offered purchasers an opportunity to participate in a rental pool arrangement ("RPA").[2] This was optional and the Libermans had not participated in the rental pool.

In arranging the sale of the Libermans' condominium, Dubois advised him of the availability of the rental pool arrangement. *See* note 1 *supra.* Hocking purchased the condominium unit from the Libermans on June 23, 1979. On July 5, 1979, Hocking entered into a rental management agreement with Hotel Corporation of the Pacific ("HCP") and a rental pool agreement that was to take effect six months later. Although the record is not clear on the relationship between HCP and the developer, Aetna, it appears that HCP performed management services at the option of the condominium purchasers.

Hocking subsequently filed suit alleging violations of the antifraud provisions of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (1982), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1987), and state law claims of fraud, negligence, and breach of fiduciary duty. He alleged various acts of fraud by Dubois in inducing him to buy the unit and in services she performed or failed to perform thereafter. The district court granted summary judgment for defendants on the securities claim and dismissed the pendent state claims for lack of subject matter jurisdiction.

## II.

We review the grant of summary judgment *de novo.* *SEC v. Belmont Reid & Co.,* 794 F.2d 1388, 1390 (9th Cir.1986). Our task is identical to the trial court's: while viewing the evidence in the light most favorable to Hocking, we must determine whether the defendants have shown that there are no disputed issues of material fact and that they are entitled to judgment as a matter of law. *Alaska v. United States,* 754 F.2d 851, 853 (9th Cir.), *cert. denied,* 474 U.S. 968, 106 S.Ct. 333, 88 L.Ed.2d 317 (1985). We also review *de novo* the district court's determination whether a transaction is a security. *Belmont Reid & Co.,* 794 F.2d at 1390.

## III.

The term "security" is defined in section 2 of the Securities Act of 1933, 15 U.S.C. § 77b(1) (1982), and in section 3 of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10) (1982). The sections, which are substantially identical, *Tcherepnin v. Knight,* 389 U.S. 332, 335–36, 88 S.Ct. 548, 552–53, 19 L.Ed.2d 564 (1967), define a security to include any "investment contract." However, the definition is not a static one. Congress cast it "in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security." H.R.Rep. No. 85, 73d Cong., 1st Sess.

---

**2.** Under an RPA, an agent is responsible for renting and managing the resort project. The rental income from the units is pooled, and after each owner is assessed a pro rata share of the agent's costs, each owner receives a pro rata share of the rental income whether or not the owner's individual unit actually was rented.

11 (1933).[3] It embodies a flexible principle "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946); *see also United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed. 2d 621 (1975).

The now classic definition of an investment contract is found in *SEC v. W.J. Howey Co.* In *Howey*, investors purchased portions of a citrus grove in Florida. The seller offered each investor a land sales contract and a service contract under which defendant cultivated, harvested, and marketed the fruit. The service contract was for a ten-year period with no option to cancel. The investors nominally owned the land, but had no right to specific fruit or to enter the land. Their rights were limited to the receipt of profits from the pooling of all the harvested fruit. 328 U.S. at 295–96, 66 S.Ct. at 1101–02. The Court noted that the buyers lacked the knowledge, skill, and equipment necessary in the citrus fruit business and that the only way they could hope for a return on their investment was by absolute reliance on the efforts and abilities of the Howey Company. *Id.* at 299–300, 66 S.Ct. at 1103–04. The Court, in finding an investment contract, held:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nom-

inal interests in the physical assets employed in the enterprise.

328 U.S. at 298–99, 66 S.Ct. at 1103. Under *Howey*, then, an investment contract consists of (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profits produced by the efforts of others.[4]

■ Generally, simple transactions in real estate, without more, do not satisfy the *Howey* criteria. *See, e.g., De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1301 (9th Cir.1979) (defendants' only obligation to purchaser was to transfer title); *Woodward v. Terracor*, 574 F.2d 1023, 1025 (10th Cir.1978) (same); *Mosher v. Southridge Associates*, 552 F.Supp. 1231, 1232 (W.D.Pa.1982) (sale of condominium with no attendant restrictions); *Johnson v. Nationwide Industries*, 450 F.Supp. 948, 953 (N.D.Ill.1978) (no allegation of a collateral arrangement in addition to the transfer of land), *aff'd*, 715 F.2d 1233 (7th Cir.1983); *Happy Investment Group v. Lakeworld Properties, Inc.*, 396 F.Supp. 175, 180 (N.D.Cal.1975) (defendants performed no skilled activities after land transferred). When a purchaser is motivated exclusively by a desire to occupy or develop the land personally, no security is involved. *See, e.g., Howey*, 328 U.S. at 300, 66 S.Ct. at 1103; *Joyce v. Ritchie Tower Properties*, 417 F.Supp. 53, 55–56 (N.D.Ill.1976) (purchase of condominium as personal residence).

Real estate transactions may involve an offer of securities when an investor is offered both an interest in real estate *and* a collateral expectation of profits. *See Forman*, 421 U.S. at 853 n. 17, 95 S.Ct. at 2061 n. 17. However, drawing the line between the offering of land sales contracts and investment contracts has not been easy.

---

**3.** The remedial purposes of the 1933 Act were expressed as follows:

> The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by dishonest securities offered to the public through crooked promotion. . . .

S.Rep. No. 47, 73d Cong., 1st Sess. 1 (1933).

**4.** This test has led courts to classify a wide variety of novel economic schemes as "investment contracts." *See, e.g., Smith v. Gross*, 604 F.2d 639, 642–43 (9th Cir.1979) (per curiam) (earthworms); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478–85 (5th Cir.1974) (cosmetics); *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414, 416–18 (8th Cir.1974) (chinchillas).

To resolve this difficulty, at least in the area of condominiums, the Securities and Exchange Commission issued guidelines in 1973 on the applicability of federal securities laws to the burgeoning resort condominium market. *See* Offers and Sales of Condominiums or Units in a Real Estate Development, Securities Act Release No. 33–5347, 1 Fed.Sec.L.Rep. (CCH) ¶ 1049 (Jan. 4, 1973) (listed at 17 C.F.R. § 231.5347 (1987)). We read the *Howey* criteria in light of those guidelines.

■ In Release 5347, the Commission states unequivocally that it will view a condominium as a security if it is offered with any one of three specified rental arrangements.[5] The second of these arrangements, the controlling one here, is "[t]he offering of participation in a rental pool arrangement." 38 Fed.Reg. 1735, 1736 (1973). Unlike a transaction covered under the first arrangement, the offering of a condominium with an RPA *automatically* makes the investment a security.[6]

■ The district court, in its order granting summary judgment to Dubois, seems to have recognized that the second arrangement described in the SEC guidelines is the type of arrangement involved here. Nevertheless, the court decided that the rule governing the second arrangement was not controlling because the RPA at issue here was *optional.* This was incorrect. Whether Hocking was offered a security does *not* depend on the optional or discretionary nature of the RPA. Rather, it depends simply upon whether the offer included an RPA, so that the offeree, if he or she chose to participate, could do so. Indeed, in *Howey*, the investors were not required to enter into service contracts with the defendants. The investors were merely told that the investment was not feasible without a contract, and that the defendants' contract was superior to all others. 328 U.S. at 295, 66 S.Ct. at 1101. The Court's conclusion that the transaction was an investment contract was "unaffected by the fact that some purchasers choose not to accept the ... service contract." *Id.* at 300, 66 S.Ct. at 1104. "[I]t is enough that the [defendants] merely *offer* the essential ingredients of an investment contract." *Id.* at 301, 66 S.Ct. at 1104 (emphasis added). Similarly, the fact that Hocking's participation in the RPA was not compulsory would not preclude the finding of a security here. *See Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187, 193 (5th Cir.1979) (investors could refuse to rent out their campsites or could rent them out personally), *on reh'g*, 611 F.2d 105 (5th Cir.1980); *Wool-*

---

5. The release summarizes three situations which would involve the offering of a security:

 1. The condominiums, with any rental arrangement or other similar service, are offered and sold with emphasis on the economic benefits to the purchaser to be derived from the managerial efforts of the promoter, or a third party designated or arranged for by the promoter, from rental of the units.

 2. The offering of participation in a rental pool arrangement; and

 3. The offering of a rental or similar arrangement whereby the purchaser must hold his unit available for rental for any part of the year, must use an exclusive rental agent or is otherwise materially restricted in his occupancy or rental of his unit.

38 Fed.Reg. at 1735, 1736 (1973).

6. Whether the condominium is offered with emphasis on the benefits to be derived from the efforts of others is relevant only where there is a *non-pooled* rental arrangement. This is because only Arrangement 1 contains the phrase "emphasis on the benefits to the purchaser to be derived from the managerial efforts of [others]."

It is clear that Arrangement 2 is meant to provide the exclusive coverage for RPAs. While the language of Arrangement 1 is general, ostensibly covering "any rental arrangement," giving that phrase an all-inclusive interpretation would render meaningless the language of Arrangement 2.

The SEC makes this conclusion clear elsewhere in its guidelines. Compare, for example, the following two statements from the Release:

The offer of the unit together with the offer of an opportunity to participate in such a *rental pool* involves the offer of investment contracts which must be registered unless an exemption is available....

 . . . . .

If the condominiums are not offered and sold with emphasis on the economic benefits to the purchaser to be derived from the managerial efforts of others, ... an owner of a condominium unit may, after purchasing his unit, enter into a *non-pooled rental* arrangement ... without causing a sale of a security to be involved in the sale of the unit.

1 Fed.Sec.L.Rep. (CCH) ¶ 1049 at 2071–2072 (1973) (emphasis added).

*dridge Homes, Inc. v. Bronze Tree, Inc.,* 558 F.Supp. 1085, 1087 (D.Colo.1983) (defendant's managerial services were optional after initial two-year period).

Release 5347 is controlling here, and compels the conclusion that the offer of the condominium with an RPA option constituted the offer of a security.

### IV.

■ Even apart from the guidelines, we find that under the three *Howey* criteria an offer of a condominium with an RPA constitutes an offer of an investment contract.

1. *Investment of Money.* Defendants do not dispute that the condominium purchase satisfied *Howey's* first requirement. Hocking invested money in the condominium.

2. *Common Enterprise.* There has been some disagreement among the circuit courts of appeals on what satisfies the requirement of a common enterprise. *See Mordaunt v. Incomco,* 469 U.S. 1115, 1115–16, 105 S.Ct. 801, 801–02, 83 L.Ed.2d 793 (1985) (White, J., dissenting from the denial of certiorari). Some require "horizontal commonality," usually evidenced by a pooling of assets from two or more investors into a single investment fund. *See, e.g., Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 622 F.2d 216, 222 (6th Cir.1980), *aff'd on other grounds,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); *Hirk v. Agri–Research Council, Inc.,* 561 F.2d 96, 100–01 (7th Cir.1977); *Wasnowic v. Chicago Board of Trade,* 352 F.Supp. 1066, 1070 (M.D.Pa.1972), *aff'd,* 491 F.2d 752 (3d Cir.1973), *cert. denied,* 416 U.S. 994, 94 S.Ct. 2407, 40 L.Ed.2d 773 (1974). The Fifth Circuit has rejected horizontal commonality in favor of "vertical commonality"—focusing on investor dependence on promoter expertise rather than the fortuity of collective investments. *SEC v. Continental Commodities Corp.,* 497 F.2d 516, 522 (5th Cir.1974); *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 478 (5th Cir.1974). We accept both horizontal and vertical commonality.

Horizontal commonality describes the relationship shared by two or more investors who pool their investments together and split the net profits and losses in accordance with their pro rata investments. *See Brodt v. Bache & Co.,* 595 F.2d 459, 460 (9th Cir.1978). ("This pooling of interests, usually combined with a pro-rata sharing of profits, has been characterized as *horizontal* commonality." (emphasis in original)). By pooling their assets and giving up their claims to any profit or loss attributable to their particular investments, investors make their collective fortunes dependent on the success of a single common enterprise. Clearly, horizontal commonality describes the relationship that purchasers of a company's securities share with one another. This is the standard, run-of-the-mill situation for which the securities laws were designed to apply.

The strictest definition of common enterprise involves only horizontal commonality, i.e., an investor pooling assets with other investors. *Id.; see, e.g., Hirk,* 561 F.2d at 101. However, we define common enterprise more broadly, as a venture in which the "fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment *or of third parties." SEC v. Glenn W. Turner Ent., Inc.,* 474 F.2d 476, 482 n. 7 (9th Cir.) (emphasis added), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); *Brodt,* 595 F.2d at 460. Vertical commonality does not require that several investors pool their funds. Rather, "vertical commonality requires that the investor and the promoter be involved in some common venture without mandating that other investors also be involved in that venture." *Brodt,* 595 F.2d at 461; (citing *Hector v. Wiens,* 533 F.2d 429, 433 (9th Cir.1976)). When vertical commonality is permitted, even a venture that has but a single investor can be a common enterprise if the promoter's remuneration depends on the success of the venture. To summarize, horizontal commonality describes a common enterprise among several investors, while vertical commonality describes a common enterprise between the investor and the seller, promoter or some other party. *See* L.

Loss, *Fundamentals of Securities Regulation* 197 n. 1 (1983).

When we embraced vertical commonality in *Brodt*, we did not state that we intended to *replace* horizontal with vertical commonality; rather, we broadened the meaning of common enterprise beyond the "strict pooling requirement" used by other circuits. 595 F.2d at 460.[7] In other words, we simply added an additional means of establishing a common enterprise, which comes into play only when there is no pooling of funds by several investors in a venture. *See El Khadem v. Equity Securities Corp.*, 494 F.2d 1224, 1229 (9th Cir.) (court looks first for horizontal and then vertical commonality), *cert. denied*, 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974).

A rental pool arrangement creates *horizontal* commonality with other parties involved in the RPA. If Dubois' offer to sell the condominium did not include the option of joining the RPA, then Hocking's investment in the condominium would be his alone and not an investment in a common venture. In the absence of other investors, there would be no horizontal commonality and following *Brodt*, it would be proper to move on to an examination of the vertical relationship involved. But, as we have noted earlier, we assume for purposes of this opinion that the offer of a condominium to Hocking did include an offer of an option to enter an RPA. Accordingly, horizontal commonality exists.

It is readily apparent that an RPA for condominiums is a common enterprise. Each investor buys one share—a condominium—in a common venture that pools the rents from all of the units. The success of each participant's individual investment clearly depends on the entire RPA's success. At least with respect to the common enterprise prong of *Howey*, this is precisely the reason why the SEC felt that an offer

of a condominium with an option for RPA *automatically* constitutes the offer of a security.

3. *Expectation of Profits Produced by Others' Efforts.* With respect to the third prong of *Howey*, i.e., the expectation of profits produced by the efforts of others, we conclude that this requisite is met *whenever* a condominium is sold with an RPA option. This is what the Commission has done in its guidelines for condominiums. The rationale of the SEC's *automatic* application of the securities laws to RPAs is not expressly set forth in the Release. However, in 1972 the Real Estate Advisory Committee, which the late former SEC Chairman William Casey established to address the applicability of the securities laws to real estate investments, published its recommendations and reasoning. *See* SEC, *Report of the Real Estate Advisory Committee* (1972). The Committee concluded that "where a rental pool is made available in the course of the offering, what is really being sold to the purchaser is an investment contract whereby profits are expected to be produced if at all, through the efforts of a party other than the purchaser-owner." *Id.* at 77–78. The Committee's recommendations regarding condominiums were substantially adopted by the SEC in its 1973 guidelines. We believe that the logic underlying the Release is clear and provides the basis for the proper construction of *Howey*.

■ The SEC and its advisory committee recognized the wisdom of having a rule that would make the sale of all the condominiums in a particular condominium development subject to the securities laws or would exclude the sale of all those units—regardless of the fortuity of the individual economic expectations of the particular buyer. A rule, the applicability of which depended on the subjective intentions of

---

**7.** Professor Loss explains the fact that vertical commonality is the broader of the two requirements:

The broadest view is satisfied with "vertical commonality"; that approach recognizes a "common enterprise" between broker and customer, without insisting on any sort of pooling among customers' accounts. A strict-

er view does insist on such pooling: "horizontal commonality." The strictest view is not satisfied, at least with merely vertical commonality, unless the broker himself shares in the enterprise apart from his commissions. (citations omitted)

L. Loss, *Fundamentals of Securities Regulation* 255 (1983) (footnotes omitted).

each individual prospective purchaser of each separate unit, would be extremely difficult to administer and would be arbitrary inasmuch as it would make the seller's—and any broker's—liability depend on the undisclosed and often unformed thoughts of the buyer. Even a specific condominium unit could on one day be a security and the next not, depending on the investment attitudes of a particular prospective purchaser on a particular day. For these reasons the SEC's Real Estate Advisory Committee was willing to recommend "rather mechanical tests" with respect to condominium investments, which the SEC adopted in its guidelines. *Id.* at 78. We agree, and believe that the Release's bright line rule reflects the only proper interpretation of *Howey* as applied to condominiums. The purchase of a condominium with an RPA option thus meets the third *Howey* requisite that there be an expectation of profits based upon the entrepreneurial or managerial efforts of others.[8]

Not only, then, does the alleged transaction at issue constitute the offer of a security under the SEC guidelines, but it also

constitutes a security under the test set forth in *Howey*.

### V.

We address appellee's argument that the condominium is not a security because it was not offered to Hocking by Aetna, the developer, and that because Dubois was not Aetna's agent she could not be found liable for her actions under the securities laws. We address these two arguments separately.

 In appellees' view, the condominium ceased to be a security at the time the Libermans purchased it because the Libermans chose not to participate in the RPA, and, therefore, the sale to Hocking did not involve the transfer of an interest in an RPA. Thus, the gist of appellees' logic is that the condominium was not a security because there had been an intermediate buyer who chose not to participate in the RPA. A rule such as this for determining whether an investment is a security makes no sense in the context of condominiums, or, for that matter, of any investment.

---

**8.** The third *Howey* criterion originally was that profits from the investment ought to accrue "solely from the efforts of others." *Howey,* 328 U.S. at 301, 66 S.Ct. at 1104. However, neither the Court nor this circuit has applied this criterion rigidly. For example, we have found securities to exist when profits are made in part by the efforts of others, and in part through the efforts of the purchaser. *See SEC v. Glenn W. Turner Ent.,* 474 F.2d 476 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). In *Glenn W. Turner Ent.,* we held that the *Howey* test should be construed to require that "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." 474 F.2d at 482. When the Supreme Court next considered the *Howey* test in *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), the Court appears to have assented to the reading proposed by *Turner,* omitting "solely" and including the modifiers "entrepreneurial or managerial" before "efforts." 421 U.S. at 852, 95 S.Ct. at 2060.

Just as the *Howey* test allows us to find the existence of a security when profits are expected from the purchaser's own efforts as well as from the efforts of others, it also allows us to find a security when profits are expected from appreciation of condominium value at time of

resale as well as from the efforts of others. This latter situation characterizes the facts here, where profits from the investment in a condominimum with an RPA may come from 1) the condominium's pro rata share of net rents from the RPA, which depends upon the efforts of others, and 2) the appreciation on the condominium at the time of resale, which does not depend upon others' efforts.

The existence of these two avenues for profit also characterized the facts of *Howey,* where profits came from harvested fruit, but also from the increased value of the land over time. What was important there, as is important here, is that the profits during the period of ownership come from the entrepreneurial or managerial efforts of others, and that the efforts of those other than the investor are the "undeniably significant ones". *SEC v. Glenn W. Turner Ent.,* 474 F.2d at 482. *See also SEC v. Goldfield Deep Mines Co. of Nev.,* 758 F.2d 459, 464 (9th Cir. 1985); *Hector v. Wiens,* 533 F.2d 429, 433 (9th Cir.1976) (per curiam). *Howey,* therefore, does not contemplate that profits must come only from the efforts of others, and not also from increased land values. Our reasoning is consistent with that of the SEC, for the guidelines contemplate that the offer of a condominium with an RPA option necessarily constitutes the offer of a security, irrespective of an expectation of profits from appreciation at the time of resale.

The fundamental problem with this reasoning is that it misperceives the nature of an option. According to Hocking, the rental pool arrangement was an optional arrangement available to anyone buying a unit in the condominium project. Any purchaser could choose whether to participate in the RPA at the time of purchase or at a later date. Similarly, any subsequent purchaser could elect to participate regardless of the prior owners' decisions.[9] There exists no logical reason for appellees' assumption that the option somehow mysteriously disappeared from the scene following the Libermans' purchase of the condominium. Just because the Libermans did not exercise their option to enter the RPA that came with their condominium does not mean that the option itself ceased to exist. Rather, the option, at least as it is described by Hocking, continued to exist, and Hocking obtained the right to exercise that option and enter the RPA as a part of his acquisition of the condominium.

The appellees seem to recognize that the optional nature of an RPA has nothing to do with whether a condominium is a security. However, they argue that, while the fact that the RPA was optional does not affect the characterization of the condominium as a security, somehow the fact that the Libermans did not exercise their option does. Both of these facts should be equally irrelevant to this characterization, just as should the fact that Hocking chose to exercise his option. If the optional nature is irrelevant, so must be the fact that an individual has chosen to exercise or not to exercise that option.

 Conceivably, appellees could be suggesting that no security was involved because the Libermans offered only the condominium and the rental pool manager offered the RPA. If so, we cannot agree with this view. What determines the applicability of the securities laws here is *what*

tangible bundle of rights was actually offered to or purchased by the buyer, not *who* offered or sold those rights to him. Drawing distinctions based on the fact that one party offered the real estate and another the RPA is precisely the sort of form-over-substance interpretation that Congress, the SEC and the courts have sought to avoid through the broad drafting of the securities laws and their mandated liberal construction. In *Howey*, for example, there were two companies, one that sold the orange groves and another that managed the pooled growing and marketing of the oranges. This separation did not prevent the Court from finding that the two companies' products were offered together. *See* 328 U.S. at 296, 66 S.Ct. at 1101.

The same willingness to look to the substance of a transaction rather than its form is reflected directly in the SEC's treatment of resort condominium investments. Immediately after publication of the SEC's 1973 release on condominiums, one developer attempted to evade the reach of the release by not including the rental pool arrangement in its advertisements and informing investors of the availability of a separate company's pooling program only after they expressed an interest in purchasing for investment purposes. The SEC obtained a permanent injunction against this practice. *SEC v. Marasol Properties,* [1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,159 (D.D.C. Sept. 28, 1973). As one commentator put it, *Marasol Properties* serves as "an effective warning to condominium developers that courts are willing to look beyond form to the economic realities and the substance of a scheme." Note, *Federal Securities Regulation of Condominiums: A Purchaser's Perspective,* 62 Geo.L.J. 1403, 1413 (1974).

Furthermore, the SEC has refused to accede to the argument that there is no

---

**9.** While we use the term "option" here, we do not intend the term to connote that Hocking, or indeed the Libermans, had an absolute legal right to enter into the pooling arrangement without the consent of the rental pool manager. Here, as in *Howey,* it is of no significance that the pool operator retained some discretion, at

least in theory, to refuse to contract with the realty owner. Rather, we must look, as the *Howey* court did, to the practical realities of the situation, and to whether an RPA option was actually offered. *See Howey,* 328 U.S. at 299–301, 66 S.Ct. at 1103–04.

offer of a security even where the RPA terminates with the previous condominium owner. *Embarcadero*, SEC No–Action Letter, [1976–77 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 80,956 (Dec. 3, 1976). The argument was raised before the SEC by a local real estate broker, who inquired whether he would be subject to the securities laws if he resold units in a condominium project that had a rental pool arrangement. The units were originally registered as securities and sold on that basis. Upon sale of a unit the existing rental pool agreement terminated and the new purchaser was required to apply separately to enter the rental pool, without any assurance of acceptance and with the decision left to the discretion of the rental pool manager. The real estate broker's argument was that because the existing RPA terminated when a condominium was resold, the resale involved only the condominium and therefore was not a security. The SEC refused to issue a no-action ruling on these facts.[10] Thus, on facts far more favorable to the broker than those presented here, the SEC declined to accept the view that a purchaser of a condominium with an RPA could somehow uncouple the two and sell only the condominium.

Finally, were courts to follow appellees' theory—that what was admittedly a security when offered by the issuer could cease to be one when it reaches the hands of a subsequent purchaser, merely because an intermediate buyer separates the two parties—the result would be erratic and inconsistent applications of the securities laws to condominium investments. A unit in a condominium project originally developed with an RPA would remain a security in the hands of successive purchasers until one chose not to use the RPA—although when a later purchaser of the same unit entered the RPA, the unit would again become a security. Conceivably, then, a unit could alternate between being a security and not

being one as each successive purchaser made his individual decision whether to participate in the RPA. Applying this theory generally to investments other than condominiums would lead to equally absurd results. Moreover, a system of demarking the scope of the securities laws as ephemeral as this one would be far worse in its effect on condominium developers and brokers than would the more inclusive rule espoused by the SEC.[11] To hold that an offer of a condominium with an option to participate in an RPA is not an offer of a security, would therefore, make little practical or legal sense.

## VI.

■ We consider finally whether Dubois, as Hocking's broker, may be held liable for misrepresentations she allegedly made to her client. Section 10(b) and Rule 10b–5 expressly extend to fraudulent statements made "in connection with the purchase or sale of any security," regardless of who makes them. 15 U.S.C. § 78j(b) (1982); 17 C.F.R. § 240.10b–5. Thus, liability under these antifraud provisions is not limited to the seller of a security or his agents; it includes all brokers regardless of whom they represent.

Because the condominium with its RPA is a security, Dubois acted as Hocking's securities broker. Just like any other purchaser of securities, Hocking may sue his own broker for fraudulent representations made in connection with the offer or sale of a security. *See, e.g., Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767 (9th Cir.1984) (broker's misrepresentation of rumor as fact supported finding of section 10(b) violation); *Toombs v. Leone*, 777 F.2d 465 (9th Cir.1985) (broker not liable because no material misstatement or omission made). It is relatively common for securities purchasers to sue their own brokers; often, the sellers of the securities are not even known, let alone the sellers' brokers. A

---

**10.** While a no-action letter contains only the informal advice of SEC staff, it reflects what the staff's enforcement recommendation to the Commission will be if a transaction is consummated exactly as described in the response. *See* 17 C.F.R. § 200.81 (1986).

**11.** *See* discussion *supra* regarding the benefit of a bright line rule for the treatment of condominiums as securities.

security broker's liability is not dependent on whether the seller is a defendant in the action or whether the broker acted as the seller's agent.[12] Of course, Dubois' liability will depend on whether Hocking can show a fraudulent representation or other violation of a duty owed by Dubois to Hocking. That issue is not before us now.

Accordingly, the judgment below is reversed and the case is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

HUG, Circuit Judge, dissenting:

I respectfully dissent.

The essential issue in this case is whether an "investment contract" was offered to Hocking. The majority correctly notes that, under some circumstances, a real estate offering can constitute an "investment contract" and thus a "security" within the meaning of the federal security laws. The Supreme Court has defined an investment contract in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946), as follows:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party....

My basic disagreement with the majority is that while the securities laws may well extend to a promotion by a developer who offers a condominium with a management arrangement giving the buyer the comfort of doing nothing but collecting the checks from the developer's efforts, they do not extend to this attenuated transaction. The Libermans sold their unit to Hocking. They had no authority to commit Aetna or HCP to allow Hocking to participate in the rental pool. Although Aetna may well

have offered the Libermans an investment contract, the Libermans did not buy the investment contract; they simply bought a parcel of real property. That is all they were selling—a parcel of real property.

Just because a prospective buyer may be able to reach an arrangement with the developer's rental pool to rent his unit, this surely does not mean that any time a unit owner simply sells his unit, one year, ten years, or thirty years thereafter, he is selling a security. For the same reason, a broker who simply arranges for the sale of the unit and notifies the buyer that he may be able to enroll in the developer's rental pool is not offering a security. This is a real estate transaction and is properly governed by real estate law.

The majority's analysis extends the concept of an "investment contract" well beyond the Supreme Court's interpretation in *Howey*. The *Howey* test is designed to cover the situation where the investor is induced to buy a parcel of real estate because the promoter is offering to make his investment profitable through management of the real estate. In *Howey*, the buyer of the ten acres of orange grove land in the middle of an orchard was relying, not on the intrinsic value of the ten acres or the use to which he could put them, but instead upon the promoter to tend and harvest the oranges and send him a check for the proceeds.

The SEC has applied this principle to condominiums. SEC Release 5347 seeks to establish the rules governing when such a promoter must register his condominium project as a security. It is a rather breezy release, in letter style, setting forth some bright line rules for when condominium developers must register their projects. As the release notes in its footnote 1, "where an investment contract is present,

**12.** The reach of the rule that a person not connected with the seller who makes misleading statements that affect a securities purchase can be sued under section 10(b) and Rule 10b–5 is illustrated by one recent case, in which a columnist for the Wall Street Journal was found criminally liable for a 10(b) violation. *United States*

*v. Carpenter,* 791 F.2d 1024 (2d Cir.1986), *aff'd by an equally divided Court,* — U.S. —, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). A number of years earlier our court reached a similar conclusion in a civil case. *Zweig v. Hearst Corp.,* 594 F.2d 1261 (9th Cir.1979). The offer of a security by a real estate broker is well within this rule.

572

it consists of the agreement offered and the condominium."

The release is intended to notify developers of a bright line rule of when they must register their projects. It purports to apply *Howey* and [*Securities and Exchange Com'n v. C.M.*] *Joiner* [*Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943)] and is reasonably accurate when it states:

In other words, condominiums, coupled with a rental arrangement, will be deemed to be securities if they are offered and sold through advertising, sales literature, promotional schemes or oral representations which emphasize the economic benefits to the purchaser to be derived from the managerial efforts of the promoter, or a third party designated or arranged for by the promoter in renting the units.

But it moves away from the *Howey* concept and its own reasoning when it states in the following paragraph that the mere offering of a condominium in conjunction with participation in a rental pool arrangement "will cause the offering to be viewed as an offering of securities in the form of investment contracts."

While the Supreme Court has cited the release, *see Forman,* 421 U.S. at 853 n. 17, 95 S.Ct. at 2061 n. 17, it has expressed no opinion on the SEC's interpretation of *Howey.* Several writers have challenged that interpretation. *See, e.g.,* Rosenbaum, *The Resort Condominium and the Federal Securities Laws—A Case Study in Governmental Inflexibility,* 60 Va.L.Rev. 785 (1974); Comment, *The Economic Realities of Condominium Registration Under the Securities Act of 1933,* 19 Ga.L.Rev. 747 (1985); Comment, *Looking Through Form to Substance: Are Montana Resort Condominiums "Securities"?,* 35 Mont.L.Rev. 265 (1974). Although I have some doubts whether the mere offer by a developer of a rental pool, regardless of promotional emphasis, truly meets the *Howey* test (or satisfies the release's earlier reasoning), we need not determine that issue because we are not concerned with a developer who is offering a complete package of a condominium and a rental pool that is operated by or arranged for by the developer. We are here concerned with a condominium owner who has no connection whatsoever with a rental pool.

The majority applies SEC Release 5347 to a broker who extends the offer of an individual homeowner to sell his unit because the offer includes an *"option"* to participate in a rental pool of the original developer. It is most doubtful that the SEC release was designed to apply to this circumstance, and even more doubtful that the *Howey* test could apply.

An even more fundamental objection, however, is the fact that there exists no evidence that the Libermans had, or Dubois offered, such an *"option."* The entire majority opinion is premised on the conclusion that there exists a genuine issue of material fact as to whether the offer from the Libermans that was communicated to Hocking included an *"option"* to participate in the rental pool operated by the developer. (See page 562 and footnote 1.) I find no evidence in the record that even suggests an option was offered. The Libermans had not participated in the rental pool themselves. They simply bought a condominium and were selling that condominium. Dubois was the real estate agent who communicated the Libermans' offer to sell the condominium to Hocking. She also alerted Hocking to the existence of the developer's rental pool. There is no evidence in the record that the Libermans had a transferable *"option"* to enter the rental pool that was binding on the developer, nor that Dubois communicated an offer of such an *"option"* along with the offer to sell the condominium.

The evidence cited by the majority in footnote 1 does not support a finding that an *"option"* was offered. Hocking's statement that he had been informed of the availability of the developer's rental pool is no indication that Dubois offered, or that the Libermans were able to convey, an enforceable option for a new purchaser to enter the rental pool. Nor does the fact that Hocking eventually enrolled in the rental pool provide such evidence.

In summary, I submit that, regardless of the validity of the SEC's bright line rule for the purpose of requiring developers to register their projects, it makes no sense to apply that rule to this case. Here we have the Libermans, who bought a unit, rejected the rental pool, and now seek to sell the unit. Dubois notified Hocking that if he bought the unit he could perhaps participate in the developer's rental pool. It is hard to envision either the Libermans or Dubois as promoters offering the kind of package that constitutes an "investment contract," as defined by the Supreme Court.

I would affirm the dismissal for lack of subject matter jurisdiction because no security was involved.