UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-2220

RAUL F. RODRIGUEZ, ET AL.,
Plaintiffs, Appellants,

v.

BANCO CENTRAL CORPORATION, ET AL.,
Defendants, Appellees.

ERRATA SHEET

The opinion of this Court issued on March 30, 1993 is
amended as follows:

On page 4, line 1: "finansite" should be "site".

March 30, 1993 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-2220

RAUL F. RODRIGUEZ, ET AL.,

Plaintiffs, Appellants,

v.

BANCO CENTRAL CORPORATION, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jose Antonio Fuste, U.S. District Judge]

Before

Breyer, Chief Judge,

Aldrich, Senior Circuit Judge,

and Boudin, Circuit Judge.

Harry E. Woods with whom Fernando L. Gallardo was on brief for

appellant.
James G. McLaughlin Torres with whom Luis Sanchez-Betances,

Ivonne Cruz-Serrano, and Luis A. Melendez-Albizu were on brief for

appellee.

March 30, 1993

BOUDIN, Circuit Judge. In the district court, 152

buyers of lots of undeveloped real estate in Florida charged

the real estate company, the bank that financed the company,

and certain individuals with securities fraud under RICO, 18

U.S.C. 1962(c).1 Describing their land sale contracts as

"securities," the buyers claimed that their purchases were

induced by false representations that the land was suitable

for home sites and that the surrounding areas would develop

into a thriving community. In fact, the property turned out

to be worthless swamp land unfit for development. After a

lengthy jury trial, the district court directed a verdict for

the defendants, ruling that the land sale contracts were not

securities. The buyers appeal. We affirm the district

court.

I. BACKGROUND

The underlying facts, viewing the evidence in the light

most favorable to the buyers, can be briefly stated. The

buyers, most of whom are residents of Puerto Rico, acquired

their lots in Florida beginning in the early 1970's after

being approached by the real estate company's sales

representatives. During these meetings, the prospective

1RICO is the Racketeering Influenced and Corrupt
Organizations chapter of the Organized Crime Control Act of
1970, 18 U.S.C. 1961-68. The real estate company was J.C.
Investments, Inc. The original financing was by Banco
Economias and a group of investors. Banco Central succeeded
Banco Economias.

-2-

buyers were offered the opportunity to purchase subdivided

lots in an undeveloped site that would eventually, they were

told, include roads, schools, churches, stores and elaborate

recreational facilities. The project was touted as an

excellent investment due not only to prospective development,

but also to its close proximity to Disney World. These oral

assurances were bolstered by promotional brochures depicting

sporting activities at nearby locations and other literature

informing buyers of the development's progress.

A cautionary statement, written in small print in one of

the promotional brochures, advised that the development was

"not a homesite offering." Another pamphlet warned that

"[i]mprovements such as roads and drainage are not presently

on the property and are not contemplated." Yet another

warning, this one prominently featured in a Florida Land

Sales Board Offering Statement and included as well in a

brochure, advised buyers that the property was not usable for

building purposes, that the seller neither promised nor

contemplated any improvements, and that 35% of the land was

"marshy or swampy" and subject to flooding.

Most buyers did not read these warnings and those who

did were often told that the warnings were standard

boilerplate required for all Florida land sales. Another

response was that the swampy sites would be drained and the

water diverted to form ponds and lakes. The buyers,

-3-

according to their testimony, were assured that their land

could be used as a home site or for any other purpose.

Several chose their lots from a map which divided the

development into "residential" and "commercial" sections.

The vast majority of buyers, many of whom hoped to retire to

Florida, purchased their lots with the intention of building

a home. According to their testimony, only a few were

concerned solely with the re-sale value of their property and

had no intention of residing on or developing the lots

themselves.

The projected improvements were not made. The buyers

eventually learned, some through a local newspaper, that they

were the owners of swamp land worth a fraction of the

purchase price. At trial, the buyers produced experts who

testified that, as a result of zoning restrictions applicable

to flood-prone areas, few of the lots could be built on

legally. The experts said that, even absent the

restrictions, the area was physically unsuitable for any

broad-scale development.

On August 2, 1982, the buyers brought suit in the

district court, making claims against the real estate

company, the financing bank, and a number of individuals.

The complaint asserted claims under the Interstate Land Sales

Full Disclosure Act, 15 U.S.C. 1701 et seq., the

Securities Exchange Act, section 10(b), 15 U.S.C. 78j(b),

-4-

and RICO, 18 U.S.C. 1962(a) (use of racketeering derived

income). Much time was consumed with class action disputes,

discovery, statute of limitations issues, and various

attempts to amend the complaint. Eventually, the district

court in November 1989 dismissed all these claims but allowed

the buyers to amend in order to allege a RICO claim charging

securities fraud as predicate acts.2 Rodriquez v. Banco

Central, 727 F. Supp. 759 (D.P.R. 1989), aff'd in part and

vacated in part, 917 F.2d 664 (1st Cir. 1990).

On January 25, 1990, the district court refused to

dismiss the new RICO claim based on predicate acts of

securities fraud introduced by the new amended complaint. At

the same time the court declined to allow the buyers to

allege mail fraud under RICO. The distinction, the district

court explained, was that securities fraud had been an issue

in some form from the outset;3 mail fraud, in the court's

view, had not been alleged until after seven years of

litigation, including extensive discovery.

Trial commenced on August 5, 1991, and concluded on

September 24, 1991. The evidence submitted has already been

2The Land Sales Act and Securities Exchange Act claims
were dismissed on statute of limitations grounds. The RICO
claim under 1962(a), charging use of racketeering derived
income, was dismissed for lack of standing.

3In addition to the claim of securities fraud under the
Securities Act of 1934, the original complaint had also
mentioned securities fraud as part of the improvident RICO
claim under 18 U.S.C. 1962(a).

-5-

described briefly and is discussed further below. At the

conclusion of the evidence, the court on October 10, 1991,

granted a motion for judgment as a matter of law and ordered

judgment for all defendants, Rodriguez v. Banco Central, 777

F. Supp. 1043 (D.P.R. 1991), giving rise to the present

appeal. In its lengthy opinion, the district court held

inter alia that the land sale contracts were not securities

under the federal securities laws. In consequence, the

buyers' RICO claim failed for lack of the necessary predicate

acts.

II. THE RICO CLAIMS

RICO makes it unlawful for a person to conduct an

enterprise in or affecting interstate commerce through a

pattern of "racketeering activity." 18 U.S.C. 1962(c).

"Racketeering activity" is defined to include "fraud in the

sale of securities." Id. 1961(1)(D). For a "pattern,"

there must be at least two acts of racketeering activity

within ten years of each other, id. 1961(5), here, fraud in

the sale of securities. In this case, the buyers had a

sufficient case of fraud to put before a jury. The question

is whether it was fraud in the sale of "securities."

The district court concluded that no reasonable jury

could find the land sale contracts in this case to be

"securities," a term that the federal securities laws define

-6-

to include "investment contracts."4 Rodriquez, 777 F. Supp.

at 1060-61. Our analysis on appeal therefore begins by

parsing the terms "securities" and "investment contracts,"

distinguishing them from other forms of property or

contractual arrangements. This legal furrow has been well

plowed in prior opinions, but imaginative promoters are

constantly devising new lures and promises to tempt investors

and perplex the courts.

The definition of "investment contract" has been

bracketed by a set of Supreme Court decisions which, while

they involve facts quite different than ours, mark out our

path. SEC v. W.J. Howey Co., 328 U.S. 293 (1946) (interest

in citrus enterprise a security); and United Housing

Foundation, Inc. v. Forman, 421 U.S. 837 (1975) (interest in

apartment cooperative not a security). In essence, we have

been told by these cases that in defining securities,

substance governs form, and the substance of an investment

contract is a security-like interest in a "common enterprise"

that, through the efforts of the promoter or others, is

expected to generate profits for the security holder, either

4The courts have construed the term "securities" in
light of the definitions of the term provided by the
Securities Act of 1933, 15 U.S.C. 77a et seq., and the

Securities Exchange Act of 1934, 15 U.S.C. 78a et seq. See

Landreth Timber Co. v. Landreth, 471 U.S. 681 (1985). The

definitions appear respectively in the 1933 Act, section
2(1), 15 U.S.C. 77b(1), and the 1934 Act, section
3(a)(10), 15 U.S.C. 78c(a)(10).

-7-

for direct distribution or as an increase in the value of the

investment. Howey, 328 U.S. at 298-99; Forman, 421 U.S. at

852-53.

Each component in the concept matters. There are many

investments obtained by contract, such as one's home, that

are not an interest in an enterprise. Forman, 421 U.S. at

858. One may have an interest in an enterprise--an

employment contract, for example--that is not an entitlement

to profits or increased value. Conversely, in a sole

proprietorship the owner could have a claim on all profits of

the enterprise but there might be no contract or security

involved. Further, the Supreme Court cases mark out a

concept, not a precise definition. The term "securities," we

are told, must be flexibly applied to capture new

arrangements comprising the essence of securities, however

they may be named. SEC v. C.M. Joiner Leasing Corp., 320

U.S. 344, 351 (1943). But not all property is a security,

and fuzzy edges do not mean that the concept is unbounded.

In this case, apart from the generality of the statutory

language, a further, two-fold problem exists in applying the

concept to the land sale contracts at issue. First, what the

contracts say is not all that the buyers were told by the

salespersons; the evidence reveals that many buyers were

shown materials and given oral assurances that went beyond or

even contradicted the formal legal documents. Second, what

-8-

the buyers were shown or told, and what their own

understandings and intentions were, varied from buyer to

buyer. We start with some legal rules of thumb.

A simple sale of land, whether for investment or use, is

not a "security." E.g., Hocking v. Dubois, 839 F.2d 560, 564

(9th Cir. 1988), modified on reh'g en banc, 885 F.2d 1449

(9th Cir. 1989) (en banc), cert. denied, 494 U.S. 1078

(1990). Even if bought for investment, the land itself does

not constitute a business enterprise, and "securities" are

interests in an enterprise. Howey, 328 U.S. at 298-99.

Thus, one who buys raw land or even a building, hoping to

profit from rents or the natural increase in the value of

property, is not under normal circumstances treated as

purchasing a "security." Aldrich v. McCulloch Properties,

Inc., 627 F.2d 1036, 1039 n. 1 (10th Cir. 1980).

Conventional incidentals, such as the seller's promise to

install a road or electricity, is similarly not enough to

elevate an ordinary real estate transaction to the status of

a security. Id. at 1040.

At some point, however, the commitments and promises

incident to a land transfer, and the network of relationships

related to the project, can cross over the line and make the

interest acquired one in an ongoing business enterprise. See

Howey, 328 U.S. at 299-300. At that point, the interest may

be treated as a security, even if not so labeled. Id. at

-9-

300. And in making this appraisal, the promoter properly is

held to his representations as to what he is selling, Joiner,

320 U.S. at 353, even where those promises go well beyond the

legal terms of the contracts and the fine print of the

disclaimers.

In this case the promoters offered the land primarily as

an "investment." A number of buyers testified at trial that

the salespeople emphasized the investment value of the

project, a contention supported by a company sales' manual

introduced into evidence, stressing capital appreciation as a

prime selling point. Compare Rice v. Branigar Organization,

Inc., 922 F.2d 788, (11th Cir. 1991) (promotional materials

emphasized personal use over investment). A complication is

now introduced: while the lots were offered as an investment

by the seller, most buyers intended to live on the property

and purchased primarily for use. A purchase for use or

consumption, it is said, is not a security or investment

contract. Forman, 421 U.S. at 852-53. We need not sort out

the problem of opposing buyer and seller viewpoints, nor

search out buyers who had investment in mind, because another

aspect of the matter decides the case.

In our view even if every buyer bought for investment,

what was purchased in this case was not a share of a business

enterprise and so not a security. Taking the evidence most

favorably to the buyers, they were sold land in individual

-10-

parcels with strong and repeated suggestions that the

surrounding area would develop into a thriving residential

community. But apart from the promise of an existing lodge

or a new country club, the evidence did not show that the

promoter or any other obligated person or entity was

promising the buyers to build or provide anything. A few

scraps of evidence, usually ambiguous, may point the other

way but we do not think that a reasonable jury could conclude

on this record that the defendants were promising to

construct a community.

A security might exist if the defendants had promised,

along with the land sales, to develop the community

themselves. Then each buyer might be acquiring an interest

not only in land but in a package of commitments that, taken

together, could comprise a business venture harnessing the

entrepreneurship of the promoter. Each parcel of land would

still have a different value, unlike the typical share of

stock, but most of the potential gain might depend on the

development of the community as a whole. Cf. Joiner, 320

U.S. at 348-49 (promised oil well gave mineral leases "most

of their value and all of their lure"). The promoter's

commitment to build the community, in turn, could constitute

the "common enterprise" financed jointly by the buyers.

Howey, 328 U.S. at 299. Several decisions have taken this

view, and we think they may be correct in principle. E.g.,

-11-

McCown v. Heidler, 527 F.2d 204 (10th Cir. 1975); Miller v.

Woodmoor, CCH Fed. Secur. L. Rep. 96,109, 91,998-999 (D.C.

Colo. 1976); Aldrich, 627 F.2d at 1038-1040.

In this case, however, the most that can be said is that

the promoter left the distinct, and distinctly false,

impression that a community was going to develop through

natural forces. Many buyers were told that Disney World's

presence nearby would spur growth. Others were shown

pictures of specific sports facilities already existing at

specific distances. But aside from the lodge or country

club, there was little testimony that specific promises were

made by anyone to do specific things.5 Accordingly, what we

have is sales of property based on false representations as

to its prospects, but there is no pretence of a "common

enterprise" managed by the promoter and hence no "security."

See, e.g., Woodward v. Terracor, 574 F.2d 1023, 1025 (10th

Cir. 1978); Happy Investment Group v. Lakewood Properties,

Inc., 396 F. Supp. 175, 180-81 (N.D. Cal. 1975).

One might ask why the absence of a security should

matter. The property was made attractive by the promoter's

5The promoter proposed to convey an existing house to
the community for use as a lodge by buyers visiting their
land and offered memberships in a to-be-constructed country
club. The latter offer was accepted by none of the 152
buyers who are plaintiffs in this case. In any case,
scattered references to these limited amenities would not
transform the purchase of a lot into a share in a development
venture. See Rice, 922 F.2d at 790-91.

-12-

claims that a community would arise, and those claims were

blatantly false, or so a jury could find. But this is not a

simple "fraud" case: the buyers, seemingly through delay,

have apparently lost their fraud remedies, except for their

RICO claim based on supposed predicate acts of securities

fraud. Without securities, this RICO claim evaporates. It

is disagreeable for a court to turn away victims who have

been wronged. But we cannot disregard controlling Supreme

Court decisions or distort the securities laws to rescue

plaintiffs who have themselves cast their legitimate remedies

away.

Puerto Rico law provides ample remedies for defrauded

buyers of land. See 31 L.P.R.A. 3408-3409. The Interstate

Land Sales Full Disclosure Act, 15 U.S.C. 1701 et seq.,

offers a broad gauged federal remedy, modeled in part on the

Securities Act of 1933. Indeed, RICO itself makes mail fraud

a predicate act, 18 U.S.C. 1961(1)(A), but the buyers here

delayed too long in asserting this claim. All of these

possible claims, federal and local, could have been asserted

in a timely filed complaint in this case. Sometimes the law

itself is at fault; this time the fault is with the lawyers.

III. MISCELLANY

Ignoring their own defaults, the buyers' lawyers instead

assail the district judge. They devote the first thirty

pages of argument in their brief (no reply brief was filed)

-13-

not to the difficult legal issues of RICO and securities law,

but to claims that the district judge barred leading

questions, helped certain defendants with their answers, and

otherwise misconducted the trial.

There is some reason to believe that the district judge,

far from tilting against the buyers, took steps to preserve

what claims he could for the buyers. One effort he made to

expedite the case through certified questions was frustrated

in part by the buyers' neglect to follow a simple procedural

rule. See Rodriguez v. Banco Central, 917 F.2d at 668-69. He

also permitted the buyers to go to trial on their marginal

RICO security claim, allowing them to flesh out their

"securities" allegation through evidence of actual

representations; many other judges, we are confident, would

have dismissed the securities claims before trial in light of

the Supreme Court decisions already discussed.

In all events, the instances offered to show error and

partiality by the district judge in his conduct of the trial

are close to trivial. Trial judges are constantly making

judgments about the use of leading questions, the need to

clarify witness answers, and similar matters of trial

management. In this realm the widest possible latitude is

given to the judge on the scene. Borges v. Our Lady of the

Sea Corp., 935 F.2d 436, 442 (1st Cir. 1991). We have

examined the many examples and transcript citations provided

-14-

in the buyers' brief. Almost all are routine "calls" by the

district judge, who must make hundreds of snap judgments in

the course of a long trial, and are well within the bounds of

propriety.

The only legal point worth mentioning is the buyers'

complaint that the trial judge limited or forbade leading

questions when the buyers as part of their direct case called

certain defendants as witnesses. The buyers urge that the

judge erred by refusing to declare the witnesses "hostile"

and to allow the use of leading questions on direct. On this

point they themselves err. A "hostile" witness, in the

jargon of evidence law, is not an adverse party but a witness

who shows himself or herself so adverse to answering

questions, whatever the source of the antagonism, that

leading questions may be used to press the questions home.

See United States v. Brown, 603 F.2d 1022, 1025-26 (1st Cir.

1979).

The buyers are on stronger ground in arguing that the

rules generally permit leading questions to be used against

an opposing party. Fed. R. Evid. 611(c). This is not

because that party is a hostile witness in the technical

sense but because, however cooperative, the witness has a

built-in incentive to slide away from the question or slant

the answer. But Rule 611(c) is arguably subject to the

overriding command of Rule 611(a) that the court "shall

-15-

exercise reasonable control over the mode . . . of

interrogating witnesses" to elicit truth, avoid delay and

protect against harassment. Fed. R. Evid. 611(a). We cannot

believe, for example, that a district judge would be

compelled to allow leading questions to an adverse party

where the judge found that this mode was distorting the

testimony of a suggestible adverse-party witness.

In all events we need not decide whether the trial judge

in this case misread Rule 611(c) or precisely when and how it

may be overridden. There can be no reversal on such a ground

without a showing of prejudice, Fed. R. Evid. 103(a), and no

showing of prejudice without a proffer, ordinarily one in the

record. Fed. R. Evid. 103(a)(2). In this case there is no

showing of any specific information that might have been

elicited, pertinent to the dispositive securities issue, if

the buyers' counsel had been permitted to ask the defendants

leading questions. Without some notion of where a leading

question might have led, any error (if error there was) is

harmless. See Ellis v. City of Chicago, 667 F.2d 606, 613

(7th Cir. 1981).

The buyers' final claim is that the trial judge abused

his discretion in refusing the buyers' requests to amend

their complaint. The amendments would have alleged mail

fraud as predicate acts under RICO and stated separate fraud

or like claims under Puerto Rican law. Each of these

-16-

attempted amendments has a somewhat different history.

Neither history bears out the charge that the trial judge

erred.

The original complaint in this case was filed on August

2, 1982. No RICO count asserting mail fraud was included.6

On May 1, 1985, the magistrate ordered that the buyers "will

move to amend the complaint"; for almost two years it appears

that no amendments were proposed.7 Then amendments were

proposed by the buyers on April 10, 1987, and on June 10,

1988, but no mail fraud predicate acts under RICO were

asserted in either instance. On December 18, 1989, over

seven years after the start of the case and after extensive

discovery, the buyers for the first time sought to add mail

fraud under RICO to the case.

As for fraud claims under Puerto Rican law, no mention

was made of such claims in the original complaint. Contrary

to the buyers' brief in this court, the first amended

complaint, filed in 1987, did not assert such claims; all

that appears is a brief reference to unidentified violations

6The buyers' brief says that "averments concerning the
fraudulent use of the U.S. mails were made" in this
complaint. In fact, the complaint refers to the use of the
mails in the securities fraud claim, interstate commerce
being an element of securities fraud, but no charge of mail
fraud appears.

7The buyers' brief asserts, without record citation,
that the magistrate asked them to delay moving until after
the class certification was settled. The defendants' brief
says this is untrue.

-17-

of "the Civil Code of Puerto Rico and Law 145 of June 18,

1980," in the "jurisdiction and venue" portion of the

complaint. The Puerto Rican law claims were first made in

the second amended complaint submitted June 10, 1988,

purportedly tendered pursuant to a court order permitting a

new caption to identify plaintiffs. The district court

understandably rejected this attempt to smuggle in new

allegations, and the Puerto Rican claims were not raised in

the third motion to amend filed December 18, 1989.

This corrected version of events speaks for itself. No

reason is offered in the buyers' brief why mail fraud and

local-law claims, which should have been evident

possibilities in 1982, were not asserted straightforwardly

and in timely fashion. The further along a case is toward

trial, the greater the threat of prejudice and delay when new

claims are belatedly added. The district court did not abuse

its considerable discretion in denying leave to add new

claims years after the case began, after much discovery, and

without any adequate excuse for the delay. See generally

Tiernan v. Blyth, Eastman, Dillon & Co., 719 F.2d 1, 4-5 (1st

Cir. 1983).

The judgment of the district court is affirmed.

-18-