Eugene C. DOONER, Jr., Plaintiff,

v.

NMI LIMITED; Alan E. Clore; Guy de-Chabaneix; Michael Edwardes–Ker; PaineWebber, Inc., and Canadian Imperial Bank of Commerce, Defendants.

No. 87 Civ. 8802 (RJW).

United States District Court, S.D. New York.

Oct. 27, 1989.

before he may be awarded an accidental disability pension.

Tanner, Propp, Fersko & Sterner, New York City (Richard J. Schulman, of counsel), and Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa. (Stephen W. Miller and Paul J. Kennedy, of counsel), for plaintiff.

Laventhall & Zicklin, New York City (Robert Zicklin, of counsel), for defendants NMI Ltd., Alan E. Clore, Guy deChabaneix and Michael Edwardes–Ker.

Fried, Frank, Harris, Shriver & Jacobson, New York City (James F. Eller, of counsel), for defendant PaineWebber.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiff, Eugene C. Dooner, Jr. ("Dooner") commenced this action on December 11, 1987 against NMI Limited ("NMI"), Alan E. Clore ("Clore"), Guy deChabaneix ("deChabaneix"), Michael Edwardes–Ker ("Edwardes–Ker"), PaineWebber, Inc. ("PaineWebber") and the Canadian Imperial Bank of Commerce[1] seeking damages for breach of contract, conversion and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* On October 17, 1988, Dooner filed an Amended Complaint, clarifying his citizenship and the citizenship of certain defendants.

Dooner seeks leave to file a Second Amended Complaint pursuant to Rule 15(a), Fed.R.Civ.P., in order to add claims for (1) securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder by the Securities and Exchange Com-

1. By Stipulation, so ordered March 10, 1989, the Canadian Imperial Bank of Commerce was dismissed from the action.

mission, 17 C.F.R. § 240.10b–5, (2) common law breach of fiduciary duty and (3) common law fraud.[2] The contemplated amendment seeks punitive as well as compensatory damages on the common law claims, and adds factual specificity in the common allegations and previously existing claims. Defendants NMI, Clore, deChabaneix and Edwards–Ker object to Counts V and VI of the proposed Second Amended Complaint which contain the securities fraud claims and Count IX which contains the amended RICO claim. Defendant PaineWebber objects to the assertion of punitive damages against it. For the reasons that follow, the motion is granted.

## BACKGROUND

The allegations in the Second Amended Complaint tell the following story. Clore was the sole shareholder of numerous corporations which at various times in the period from 1985 through 1987 purchased shares of Rorer Group, Inc. ("Rorer"), a company whose securities are listed on the New York Stock Exchange. During that time, deChabaneix was an agent for Clore and Clore-owned entities. As an agent, deChabaneix carried out or directed all trading activities for Clore and Clore's corporations, and was compensated for his services on a commission basis. Edwardes–Ker was Clore's attorney and president of Clore's corporations.

In or about December 1985, Clore, deChabaneix and Edwardes–Ker ("the individual defendants") considered forming a limited partnership to purchase additional Rorer shares as a vehicle to avoid the filing requirements of the Hart–Scott–Rodino Act, 15 U.S.C. § 18a. Their counsel in New York prepared a draft of such an agreement. In early March 1986, deChabaneix approached Dooner on Clore's behalf to ascertain if Dooner was interested in entering into a limited partnership which would purchase additional Rorer shares.

Conversations then ensued among plaintiff, deChabaneix, and their respective attorneys with respect to creating such a partnership. NMI, a Cayman Islands' corporation, wholly owned by Clore, was established to act as general partner of the partnership. The president of NMI was Edwardes–Ker.

On or about March 17, 1986, NMI, as general partner, and Dooner, as limited partner, entered into an agreement (the "Agreement"), pursuant to the law of the Cayman Islands, and thereby formed a limited partnership under the name NMI Partners L.P. (the "Partnership"). The purposes of the Partnership, as set forth in Article III of the Agreement, were to acquire securities of a "Specified Issuer" for purposes of investment; if subsequently determined by NMI, to acquire control of the Specified Issuer; to "hold, sell, dispose of, exchange, transfer, vote or otherwise exercise all rights, powers, privileges and other incidents of ownership or possession" of the securities of the Specified Issuer and other partnership property; and "to engage in any and all activities related or incidental to or in furtherance of any of the above." Rorer was the "Specified Issuer" referred to in the Agreement.

Pursuant to Article IV of the Agreement, the operations and affairs of the Partnership were to be administered by NMI. NMI was empowered "to take all action necessary or appropriate to carry out the purposes of the Partnership set forth in Article III." NMI, however, was precluded from performing certain specified actions without the consent of all partners, including the "use of Partnership property for purposes other than the purposes of the Partnership."

Pursuant to Article VI and schedule A of the Agreement, plaintiff committed to contribute five percent (5%) of the Partnership capitalization, or $700,000.00, upon receiv-

---

**2.** In Counts V and VI of the Second Amended Complaint, plaintiff alleges that certain defendants violated section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), as well as section 10(b) and Rule 10b–5. Because this Court has concluded that there is no private right of action

under section 17(a), *see Eickhorst v. American Completion and Development Corp.,* 706 F.Supp. 1087, 1097–98 (S.D.N.Y.1989), plaintiff cannot rely on that provision to state a securities fraud claim.

ing a request from NMI. The other ninety-five percent (95%), or $13,300,000.00, was to be contributed by NMI.

On or about March 17, 1986, 700,000 shares of Rorer stock were purchased for the Partnership at $38.00 per share, or an aggregate purchase price of $26,600,000.00, on a fifty (50%) margin extended by Lewco Securities in New York City. The loan or loans were arranged by deChabaneix or, at his direction, by his associate John Haggerty ("Haggerty"). Immediately following the purchase of these 700,000 shares and prior to Dooner having been requested to contribute to the Partnership capital, deChabaneix, without plaintiff's knowledge, arranged for the repayment of the Lewco margin loan. The repayment was financed by additional borrowing from various banks pursuant to credit available at these banks under existing margin loan arrangements with other Clore-owned entities. The Partnership shares were then transferred to those banks or their clearing agents.

Without Dooner's knowledge, the 700,000 shares of Rorer stock were commingled with other Rorer shares previously purchased by one or more Clore-owned corporations. The resulting unsegregated holdings of Rorer shares were cross-pledged to secure various outstanding margin and/or other loans made by certain banks to other entities owned by Clore unconnected to the Partnership. On or about April 7, 1986, deChabaneix requested that Dooner contribute $532,000.00 to the Partnership. Plaintiff made this payment as directed.

From March 1986 to October 1987, substantial quantities of the unsegregated Rorer shares were (1) repeatedly purchased, pledged and sold for purposes unrelated to the purposes of the Partnership; (2) transferred among certain Swiss banks to meet margin calls or otherwise to fulfill loan requirements for other Clore owned companies; (3) transferred to other banks, including Citibank, N.A., in New York, to secure obligations of still other Clore-owned entities; and (4) transferred back from Citibank to certain Swiss banks.

The individual defendants and NMI did not operate or maintain the Partnership as a separate entity or treat its assets separate and apart from Clore's other investments. No books and records were kept of the Partnership affairs or finances, no separate bank accounts were maintained, no fiscal or tax years were established, and no financial statements or tax returns were prepared or submitted to Dooner.

Pursuant to Section 2.5 of the Agreement, the term of the Partnership was to continue until April 30, 1987. On that date, 700,000 shares of Rorer stock had a market value of $46.625 per share. Despite the expiration of the term of the Agreement, the individual defendants and NMI did not promptly commence efforts to wind up the affairs of the Partnership and to distribute all of its assets, nor did they purport to furnish an accounting of its assets.

From March 1986 until October 1987, deChabaneix had numerous telephone conversations with plaintiff in which they discussed Rorer and the prospect of acquiring control over the company. The individual defendants and NMI at all times failed to disclose to plaintiff that any of the Rorer shares acquired by the Partnership had been commingled with other Rorer shares owned by Clore, or that the Partnership shares were bought, sold, transferred and repeatedly pledged as collateral for purposes not authorized by the Agreement.

Clore and his corporations encountered extensive payment demands and margin calls following the stock market crash in October 1987. As a result, on or about October 22, 1987, the Partnership's holdings of Rorer stock were liquidated. Most of the Partnership's 700,000 shares were, along with other Rorer holdings, sold back to Rorer at $38.635 per share.

PaineWebber negotiated the sale of the Rorer shares back to Rorer as an agent for Clore, Clore's other companies and the Partnership. PaineWebber designated the accounts into which Rorer's payment for the shares was made based on instructions from the individual defendants and Haggerty. All of the proceeds of the sale were used to meet non-Partnership Clore obligations. No funds were distributed to Dooner, although PaineWebber knew of

the existence of the Partnership and the terms and conditions of the Agreement. Plaintiff made repeated requests for payment, but no offer of any payment was made until June, 1988, after the lawsuit was filed. This offer was rejected by plaintiff.

Defendants have accepted the above allegations as true for the purposes of objecting to the motion to file a Second Amended Complaint.

## DISCUSSION

■■ Rule 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." Amendments are favored as a general matter, *see East River Savings Bank v. Sect. of Housing and Urban Development*, 702 F.Supp. 448, 459 (S.D.N.Y.1988), in order "to facilitate a proper decision on the merits." *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). Unless there is a good reason to deny a motion to amend, failure to grant it is an abuse of discretion. *Forman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1966); *Guinness Mahon Cayman Trust, Ltd. v. Windels, Marx, Davies & Ives*, 684 F.Supp. 375, 381 (S.D.N.Y.1988). Reasons sufficient to justify the denial of leave to amend include undue delay, bad faith, or undue prejudice to the opposing party. *See Forman v. Davis, supra*, 371 U.S. at 182, 83 S.Ct. at 230. In addition, leave to amend will not be given when "the proposed change is clearly frivolous or advances a claim or defense that is clearly meritless." *Slavin v. Benson*, 493 F.Supp. 32, 33 (S.D.N.Y.

1980). Accordingly, if the proposed amendment fails to state a cause of action, leave to amend may be denied. *S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Bldg. 1 Housing Development Fund Co., Inc.*, 608 F.2d 28, 42 (2d Cir.1979).

NMI and the individual defendants argue that leave to add the securities fraud claims and to amend the RICO claim would be an exercise in futility because these amended claims fail to state a cause of action. The Court disagrees.

### A. *The Securities Fraud Claims*

NMI and the individual defendants contend that the proposed security fraud claims fail to state a cause of action because plaintiff's limited partnership interest did not constitute a security as defined under the federal securities laws.

■■ "The term 'security' is defined in section 3(a)(10) of the [Exchange] Act, 15 U.S.C. § 78c(a)(10), to include, inter alia, any note, stock, bond, investment contract or any instrument commonly known as security." *Perez–Rubio v. Wyckoff*, 718 F.Supp. 217, 233 (S.D.N.Y.1989).[3] The Court must look to the economic reality of a transaction, not just its label or form, in order to determine if it falls within the ambit of the federal securities laws. *E.g. International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 558, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979). The purposes of the federal securities laws are broad, including the protection of investors, *Gould v. Ruefenacht*, 471 U.S. 701, 706, 105 S.Ct. 2308, 2311, 85 L.Ed.2d 708 (1985),

---

**3.** Section 3(a) of the 1934 Exchange Act, 15 U.S.C. § 78c(a), provides in part:

When used in this chapter, unless the context otherwise requires—

. . . .

(10) The term "security" means any note, stock, treasury stock, bond debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security;" or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

and the promotion of ethical standards of honesty and fair dealing in the profession. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). In view of these purposes, the Court is obligated to interpret the securities laws flexibly. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972). On the other hand, this Court is mindful that Congress, in enacting the securities laws, did not intend to provide a federal remedy for all fraud. *Marine Bank v. Weaver*, 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982).

■ Plaintiff contends that the Agreement represents an investment contract and therefore is a security as defined under Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10). The Supreme Court has explained that an investment contract "means a contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits [4] solely from the efforts of the promoter or a third party," *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946), and (5) risks loss. *Marine Bank v. Weaver, supra*, 455 U.S. at 557–59, 102 S.Ct. at 1224–25. *Accord Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 239 (2d Cir.1985). The definition of an investment contract is designed to encompass "a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co., supra*, 328 U.S. at 299, 66 S.Ct. at 1103.

■ Under the test for an investment contract established in *Howey*, "a limited partnership interest generally is a security because such an interest involves investment 'in a common enterprise with profits to come solely from the efforts of others.'" *Mayer v. Oil Field Systems Corp.*, 721 F.2d 59, 65 (2d Cir.1983) (quoting *SEC v. W.J. Howey Co., supra*, 328 U.S. at 301, 66 S.Ct. at 1103).

■ Nevertheless, NMI and the individual defendants argue that the limited partnership in issue here is not a security because plaintiff was the only limited partner involved.[4] The objecting defendants do not attempt to explain why the number of limited partners should determine if the interest is an investment contract and therefore a security. While the number of investors involved is relevant, it is not dispositive of the threshold question of whether an investment is a security; that decision turns on whether the investment contract test enunciated above has been met. *See Vorrius v. Harvey*, 570 F.Supp. 537, 540 (S.D.N.Y.1983). There is no separate requirement in the investment contract test that a considerable number of limited partners exist in order for a limited partnership interest to qualify as a security. Apparently, the objecting defendants challenge the common enterprise element of the investment contract test.

Courts in this Circuit have held that the commonality requirement is met by either horizontal commonality, where investors' funds are pooled, or by narrow vertical commonality, where the fortunes of the investor and the investment manager are interdependent. *Perez–Rubio v. Wyckoff, supra*, 718 F.Supp. at 234; *Department of Economic Dev. v. Arthur Andersen & Co.*, 683 F.Supp. 1463, 1473 (S.D.N.Y.1988); *In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. 493, 500–01 (S.D.N.Y. 1987). *Accord* 2 L. Loss & J. Seligman, *Securities Regulation*, 930, 956–963, (3d ed. 1989); M. Steinberg & W. Kaulbach, *The Supreme Court and the Definition of "Security": The "Context" Clause, "Investment Contract" Analysis, and Their Ramifications*, 40 Vand.L.Rev. 489, 524

---

**4.** In the *Mayer* case, the Second Circuit observed that:

> [w]here the investing limited partners exercised no managerial role in the partnership's affairs, courts have held that limited partnership interests are securities, at least when, as

here, there were a considerable number of limited partners.

*Mayer v. Oil Field Systems Corp., supra*, 721 F.2d at 65. The question of whether a limited partnership interest is a security when there is only one limited partner was not addressed in *Mayer*.

(1987).[5] While horizontal commonality requires a number of investors, narrow vertical commonality can exist based on a transaction solely between a promoter and a single investor. *E.g. Department of Economic Dev. v. Arthur Andersen & Co.,* *supra,* 683 F.Supp. at 1473. The limited partnership interest here satisfies the common enterprise element of the investment contract test because it meets the requirements of narrow vertical commonality: the fortunes of plaintiff and defendants are linked so that they rise and fall together. *See Mechigian v. Art Capital Corp.,* 612 F.Supp. 1421, 1427 (S.D.N.Y.1985).

 Furthermore, in determining whether a limited partnership interest is a security:

> [c]ontrol is the fundamental consideration because without it, investors ... have fewer means of protecting their investments. They therefore are more likely to need to rely on the additional protection that the securities laws are

designed to provide, regardless of whether there are fifty investors or just one. *Henkind v. Brauser,* No. 87 Civ. 4072(MGC), 1989 WL 54109 at 6 (S.D.N.Y. May 17, 1989). In *Henkind,* a limited partnership interest was adequately pleaded as a security even though there were only two limited partners and they held a ninety-nine percent (99%) interest in the partnership, because there were no allegations that the limited partners exercised control over the partnership affairs. *Id.* Indeed, in the one case that defendants cite where a court found that a limited partnership interest held by a sole limited partner was not a security, the limited partner maintained a degree of control over the affairs of the partnership. *Bamco 18 v. Reeves,* 675 F.Supp. 826, 830–31 (S.D.N.Y.1987).

Here, in contrast, the allegations of the Second Amended Complaint portray plaintiff as a passive investor without any substantial degree of control over the affairs

---

**5.** Defendants argue that *Marine Bank v. Weaver,* *supra,* 455 U.S. at 559–60, 102 S.Ct. at 1225, requires a number of limited partners for a limited partnership interest to qualify as a security. In *Marine Bank,* neither a certificate of deposit, nor an agreement to pledge the certificate of deposit as a guarantee on a loan, was found to be a security. *Id.* at 559–60, 102 S.Ct. 1225. The Supreme Court concluded that it was "unnecessary to subject issuers of bank certificates of deposit to liability under anti-fraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking laws." *Id.* at 559, 102 S.Ct. at 1225. In that context, the Supreme Court also found that the pledge agreement was not a security. It noted that:

> Congress intended the securities laws to cover those instruments ordinarily and commonly considered to be securities in the commercial world.... The unusual instruments found to constitute securities in prior cases involved offers to a number of potential investors, not a private transaction as in this case.... Accordingly, we hold that this unique agreement, negotiated one-on-one by the parties, is not a security.

*Id.* at 559–60, 102 S.Ct. at 1225. The Court supported its holding by emphasizing the unique provisions of the pledge agreement and the fact that plaintiffs maintained a degree of control over the subject matter of the transaction "not characteristic of a security." *Id.* at 560, 102 S.Ct. at 1225. The holding of *Marine Bank* was limited to the specific agreement be-

fore the Court; an agreement that is not at all analogous to the limited partnership interests at issue in this case.

The Supreme Court has recognized that the dicta in *Marine Bank* did not prohibit privately negotiated transactions from being considered securities, *see Landreth Timber Co. v. Landreth,* 471 U.S. 681, 692, 105 S.Ct. 2297, 2304–05, 85 L.Ed.2d 692 (1985), and did not establish horizontal commonality as the sole measure to determine the common enterprise element of the investment contract test. *See Mordaunt v. Incomco,* 469 U.S. 1115–17, 105 S.Ct. 801, 801–803, 83 L.Ed.2d 793 (1985) (*denying cert. to,* 686 F.2d 815 (9th Cir.1982). In that case, Justice White, joined by the Chief Justice and Justice Brennan, dissented from the denial of certiorari because they believed that the Supreme Court should decide whether horizontal or vertical commonality satisfied the common enterprise element of the investment contract test. *Id. See also* 2 L. Loss & J. Seligman, *Securities Regulation, supra,* 928, n. 130.

This Court believes that grafting a strict numerosity requirement onto the definition of an investment contract would unnecessarily conflict with the broad remedial purposes of the security laws and would fail to allow sufficient flexibility to adapt to the "countless and variable" fraudulent schemes that Congress intended to be covered by the securities laws. *See SEC v. W.J. Howey, supra,* 328 U.S. at 299, 66 S.Ct. at 1103.

of the Partnership. This characterization has not been challenged by defendants.

Dooner has sufficiently alleged that (1) he invested in the Partnership, (2) the Partnership was a common enterprise, (3) he expected to profit from his investment, (4) the profits were to come from the efforts of NMI, the general partner, and (5) he was exposed to a risk of loss. Accordingly, plaintiff's limited partnership interest satisfies the test for an investment contract and leave to file a Second Amended Complaint adding the security fraud claims is granted.

## B. *The RICO Claim*

In Count IX of the proposed Second Amended Complaint, plaintiff alleges that the individual defendants engaged or participated in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), and conspired to violate section 1962(c) in violation of 18 U.S.C. § 1962(d).

Section 1962(c) makes it unlawful

for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

To state a cause of action under section 1962(c) a plaintiff must allege (1) conduct (2) of an enterprise [6] (3) through a pattern (4) of racketeering activity. *Sedima, S.P. R.L. v. Imrex Co. Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *Procter and Gamble Co. v. Big Apple Industrial Buildings, Inc.*, 879 F.2d 10, 14-15 (2d Cir.1989).

NMI and the individual defendants contend that plaintiff has failed adequately to allege a pattern of racketeering activity. Racketeering activity is defined to include, *inter alia*, fraud in the sale of securities, mail fraud, and wire fraud. Congress defined a pattern of racketeering activity to require "at least two acts of racketeering

activity, ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

The pattern of racketeering requirement has spawned a flood of conflicting interpretations by various federal courts. As a result, the Supreme Court, in *H.J. Inc. v. Northwestern Bell Telephone Co.*, —— U.S. ——, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989), was called upon to consider what conduct meets RICO's pattern requirement and resolve at least some of the discrepancies in interpretation among the Circuit Courts.

The Supreme Court observed that "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff ... must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* 109 S.Ct. at 2900. (emphasis in original). The Court rejected the suggestion that multiple illegal schemes are necessary to form a pattern. *Id.* 109 S.Ct. at 2899. Instead, the Court, drawing guidance from another provision in the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 922, of which RICO was a part, concluded that the relationship component of a pattern of racketeering activity was satisfied by " 'criminal conduct ... [which] embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Id.* 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e) (partially repealed)).

The Court went on to explain that:

RICO's legislative history tells us, however, that the relatedness of activities is not alone enough to satisfy § 1962's pattern element. To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity. As to this

---

**6.** An enterprise is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or

group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

continuity requirement § 3575(e) is of no assistance ... What a plaintiff ... must prove is continuity of racketeering activity, or its threat, *simpliciter*. This may be done in a variety of ways, thus making it difficult to formulate in the abstract any general test for continuity.

*Id.* 109 S.Ct. at 2901. (emphasis in original)

Nevertheless, the Supreme Court attempted to provide some much needed guidance regarding the continuity requirement.

'Continuity' is both a closed and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition ... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of closed predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement. Congress was concerned in RICO with long-term criminal conduct.

*Id.* 109 S.Ct. at 2902.

■ Generally, the threat of continued racketeering activity in the future, necessary when continuity cannot be established in a closed period of time, may be established (1) where the predicate acts are attributable to a defendant as part of a long-term association that exists for criminal purposes or (2) where the predicate acts are a regular way of conducting defendant's ongoing legitimate business or of conducting or participating in an ongoing and legitimate RICO enterprise. *Id.*

The Second Circuit has also been involved in the attempt to clarify the meaning of the RICO pattern requirement. In two cases decided simultaneously shortly before *H.J. Inc.*, the Second Circuit, sitting *en banc*, redefined its interpretation of the pattern and enterprise elements of RICO, foreshadowing much of the Supreme Court's decision in *H.J. Inc.*[7] The Second Circuit rejected its prior practice of requiring "relatedness" and "continuity" in the enterprise element, instead shifting these requirements to the pattern element. *Beauford v. Helmsley, supra,* 865 F.2d at 1391. The court in *Beauford* explained that:

a RICO pattern may be established without proof of multiple schemes, multiple episodes, or multiple transactions; and that acts that are not widely separated in time or space may nonetheless properly be viewed as separate acts of racketeering activity for purposes of establishing a RICO pattern.... [F]or a determination of whether there is a RICO pattern, each individual racketeering act should be separately counted.

*Id.*

■ In order to state a RICO claim, a plaintiff must plead a basis from which to infer that the alleged acts of racketeering activity were neither isolated not sporadic. *Id.* In *Beauford,* the mailing of allegedly fraudulent documents on several occasions to thousands of persons, with reason to believe that future mailings would occur, sufficed to state a pattern of racketeering activity. *Id.* at 1392. The Second Circuit acknowledged that its reframing of the pattern element of RICO would allow many more civil RICO cases to proceed than had the Circuit's previous interpretations, but concluded that this liberal approach was required by the statute. *Id.* at 1393.

■ Plaintiff has alleged a number of predicate acts which occurred over a period of approximately eighteen months as part of one fraudulent scheme to defraud him of his investment. At this preliminary stage in the litigation, the Court does not conclude that these predicate acts were isolated and sporadic such that they fail, as a matter of law, to state a pattern of racke-

---

7. *See United States v. Indelicato,* 865 F.2d 1370 (2d Cir.) (*en banc*) (criminal RICO), *cert. denied,* — U.S. —, 110 S.Ct. 56, — L.Ed.2d — (1989) and *Beauford v. Helmsley,* 865 F.2d 1386 (2d Cir.) (*en banc*) (civil RICO), *vacated for further consideration in light of H.J. Inc.,* — U.S. —, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989), *upheld* by order of September 15, 1989.

teering activity. *See Procter & Gamble Co. v. Big Apple Industrial Building, Inc., supra,* 879 F.2d at 18 (allegations that defendants' fraudulent action toward plaintiffs were related and connected sufficient to defeat motion to dismiss, even though acts were not directed at a large number of unrelated people). *See also Jacobson v. Cooper,* 882 F.2d 717, 720 (2d Cir.1989) (numerous predicate acts with the purpose of defrauding one victim of his real estate holdings satisfied pattern requirement). *But cf., Airlines Reporting Corp. v. Aero Voyagers, Inc.,* 721 F.Supp. 579, 583 (S.D. N.Y.1989) (close ended, single scheme involving three perpetrators, one victim and an uncomplicated transaction which occurred over only thirteen months did not present a threat of continuity sufficient to establish a RICO pattern). Accordingly, plaintiff is granted leave to file a Second Amended Complaint clarifying his RICO claim. However, if plaintiff wishes to pursue the RICO claim, he must further delineate the nature of his RICO allegations by providing the information requested in the Court's RICO Order, filed along with this decision. The Court believes that the RICO issue may well be ripe for summary judgment upon the completion of discovery. In the event that a summary judgment motion is granted dismissing the RICO claim, the Court will be receptive to an application for attorneys' fees incurred by defendants as a result of having to litigate this particular claim.

### C. *The Punitive Damages Claim*

Plaintiff seeks to assert a claim for punitive damages against PaineWebber. PaineWebber contends that allowing an amendment to assert a claim for punitive damages against it would be futile because discovery has produced no factual basis for such a claim. PaineWebber's argument might well be persuasive if this were a motion for summary judgment regarding the punitive damages issue. Plaintiff, however, seeks only to amend his complaint, and the contentions of the parties regarding facts outside the proposed pleading are not properly before the Court. Plaintiff's Second Amended Complaint alleges that PaineWebber knew the terms of the Agreement and intentionally or recklessly dis-

regarded these terms in distributing the funds from the sale of the Rorer stock. Accordingly, the request for punitive damages is not necessarily futile. If PaineWebber were correct in its assertion that no reasonable inquiry into the facts could support the punitive damages claim, then serious questions would be raised regarding plaintiff's adherence to his obligations under Rule 11, Fed.R.Civ.P. The Court invites plaintiff to reconsider the propriety of seeking punitive damages from PaineWebber in light of the facts developed during discovery, but grants leave to include this claim in the Second Amended Complaint if plaintiff believes it is well grounded in fact and complies with the requirements of Rule 11.

### CONCLUSION

Plaintiff's motion for leave to file a Second Amended Complaint is granted. Plaintiff is directed to serve and file the Second Amended Complaint by November 3, 1989. The parties shall complete discovery by November 30, 1989 and file a pretrial order or a motion for summary judgment by January 19, 1990.

It is so ordered.