### VALE NATURAL GAS AMERICA CORP.

v.

### CARROLLTON RESOURCES 1990, LTD., et al.

Civ. A. No. 92–441.

United States District Court, E.D. Louisiana.

May 21, 1992.

Felix Henri Lapeyre, Jr., Matthew J. Randazzo, III, Lapeyre, Terrell, Rusch & Randazzo, New Orleans, La., for plaintiff.

**796**

William H. Collier, William C. Hollier, Reginald J. Ringuet, Hollier & Ringuet, Lafayette, La., Larry Charles Hebert Sonnier, Hebert, Abbeville, La. for defendants.

Michael Campbell McKeogh, New Orleans, La., for John B. Ross, Burks Engineering, Inc. and Donald H. Burks.

## ORDER AND REASONS

FELDMAN, District Judge.

Before the Court is defendants' motion under Rule 12(b)(6) to dismiss plaintiff's securities law claims.

For the reasons that follow, the motion is DENIED.

### I.

This is a story of unrealized expectations in an oil and gas deal. A group of twenty of the defendants named in this case (the Carrollton group) owned undivided fractional working interests in oil and gas leases on two wells located in the Jeanerette Field in St. Mary Parish, Louisiana. The Carrollton group wanted to sell part of their interests in these leases to obtain financing for the Carrollton group's operations. The Carrollton group hired defendant, Burks Engineering, Inc., to assist in offering the mineral interests for sale.

Plaintiff, Vale Natural Gas America Corp., says that John Howard, a Carrollton group representative, gave Burks Engineering information about the Jeanerette wells. That data, it is said, included test results and reports that indicated that there was a significant amount of water in the "proposed zone of recompletion" of one of the wells. Water in the proposed zone of recompletion indicates that the well is nearing depletion. That would be something a purchaser would want to know. It would not be good news.

Burks Engineering, through Donald Burks and John Ross, assembled into a data package information concerning the Carrollton group oil and gas interests that were for sale. Plaintiff says that Burks Engineering deliberately omitted from the package the test results and reports indicating the water infusion.

Burks Engineering and Vale people began talking about oil and gas investments Burks Engineering was handling that Vale might be interested in purchasing. Included in these discussions were the Carrollton group interests. Eventually Vale and the Carrollton group reached a deal memorialized in a document called the Assignment of Production Payment.

According to the deal struck, plaintiff was to pay defendants more than $4,000,-000. In return, plaintiff was supposed to receive 100% of the Carrollton group's interest in the oil and gas revenues from the wells until it had recovered its principal plus 15% compounded interest. When and if the Carrollton group repaid the principal and interest, plaintiff would then own 15% of the Carrollton group's interest in the wells. At all times, the wells were to be operated by Carrollton Resources 1990, Ltd., one of the Carrollton group defendants.

The heart of plaintiff's case is familiar to this kind of litigation. Plaintiff simply maintains that in the course of all the meetings and negotiations none of the defendants ever told plaintiff's representatives about the dim test results and the reports. Instead, the defendants attributed productive capacity to the wells, plaintiff says, that was in fact inconsistent with the test data. The deal soured.

Plaintiff sued the defendants under many federal and state law theories: (1) that plaintiff is entitled to rescission of the Production Payment because of defendants' violations of the 1933 Securities Act, 15 U.S.C. § 77a, *et seq.*, the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, and the Louisiana Blue Sky Law, La. R.S. 51:701, *et seq.;* (2) that the plaintiff is entitled to rescission or damages under Louisiana law because of defendants' intentional and negligent misrepresentations or omissions of material facts during the negotiations about the Production Payment; (3) that the plaintiff is entitled to rescission, or damages, as well as costs and attorney's fees because the transaction was subject to redhibitory vices under Louisi-

ana law; (4) that the plaintiff is entitled to damages because defendant breached its Louisiana law duty of good faith; (5) that the plaintiff is entitled to damages resulting from the negligent failure of some to adequately supervise their agents.

## II.

### A.

Although the defendants move to dismiss the securities law claims for failure to state a claim, defendants (and plaintiff) rely repeatedly on the Assignment of Production Payment in support of their arguments. Because the Production Payment is material well outside the pleadings, Rule 12(b) requires that the Court treat defendants' motion as one for summary judgment under Rule 56. *See* Fed.R.Civ.P. 12(b).[1]

Summary judgment is appropriate if the record discloses that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). There is no genuine issue of fact if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Moreover, the mere existence of some technical factual dispute does not necessarily defeat an otherwise properly supported motion. *See Anderson v. Liberty Lobby, Inc., 477* U.S.

242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### B.

What things are securities that can be reached by the web of regulations given their life by the 1933 and 1934 Acts[2] has been a hotly disputed question for years. Defining the many species at times fairly resembles a metaphysical exercise. "Investment contracts" are said to be securities for purposes of the Securities Acts. *See* 15 U.S.C. §§ 77b(1), 78c(a)(10). Simple enough. But, interpreting these provisions, the Supreme Court long ago held that even a unique or novel device may be an investment contract if it has been "widely offered *or* dealt in under terms or courses of dealing which established [its] character in commerce as [an] 'investment contract.' " *Securities & Exchange Commission v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943) (emphasis supplied). The time-tested standard for determining whether a contract, transaction or scheme has the "character in commerce" of an investment contract is the disarmingly simple three part formulation—still the law today[3]—that was announced by the Supreme Court in *Securities & Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946). *Howey* adjusts the focus to "whether the scheme involves [1] an investment of money in [2] a common enterprise [3] with profits to come solely from the efforts of others." 328 U.S. at 301, 66 S.Ct. at 1104. We are

---

1. Rule 12(b) directs that on a 12(b)(6) motion: [if] matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56.

2. As the Fifth Circuit has recognized, " '[t]he term security has the same meaning for purposes of both the 1933 Securities Act and the 1934 Securities Exchange Act.' " *Adena Exploration, Inc. v. Sylvan*, 860 F.2d 1242, 1244 (5 Cir.1988) (quoting *Youmans v. Simon*, 791 F.2d 341, 344 (5 Cir.1986)). Similarly, the Supreme Court has held that "the definitions of 'security' in [both Acts] are virtually identical and will be treated as such in our decisions dealing with the scope of the term." *Landreth Timber Co. v.*

*Landreth*, 471 U.S. 681, 686 n. 1, 105 S.Ct. 2297, 2301 n. 1, 85 L.Ed.2d 692 (1985). The Louisiana Blue Sky Law was modeled after the federal securities laws and, therefore, federal and state courts interpret the Louisiana statute under the federal precedents. *See Abell v. Potomac Insurance Co.*, 858 F.2d 1104, 1131 (5 Cir.1988). Accordingly, the Court's analysis of whether the Production Payment in this case is a security applies equally to plaintiff's claims under the 1933 and 1934 Acts and the Louisiana Blue Sky Law.

3. *See Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 951, 108 L.Ed.2d 47 (1990) (*"Howey* provides a mechanism for determining whether an instrument is an 'investment contract.' ").

cautioned that this injunction is meant to encompass "a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299, 66 S.Ct. at 1103. These words seem easy criteria to use. Things don't always work out as they seem.

At least one court applied the *Howey* test to an oil and gas production payment virtually identical to the one at issue in this case, and determined that it was an investment contract under the securities laws. *See Johns Hopkins University v. Hutton,* 422 F.2d 1124 (4 Cir.1970). In *Hutton,* the plaintiff bought an interest in oil and gas reserves from twenty-three wells. The defendant was to extract and market oil and gas from the wells and pay the plaintiff all the proceeds from the sales until plaintiff had recovered the purchase price, 6% interest on the unpaid balance, and a designated percentage of defendant's net profits. The one difference between the *Hutton* transaction and the Carrollton group Production Payment was that the *Hutton* defendant had sold three other production payments regarding the twenty-three wells in addition to the one sold to plaintiff, and was attempting to solicit more sales of production payments. The offerings were widely circulated and marketed.

The Fourth Circuit concluded that the production payment was a security as a matter of law. *Id.* at 1128. The transaction, the court said, was " 'an investment of money in a common enterprise with profits to come solely from the efforts of others.' " *Id.* (quoting *Howey,* 328 U.S. at 301, 66 S.Ct. at 1104). The court added that the scheme met the "common offering and trading requirements" of *S.E.C. v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943). *See Hutton, supra.* Defendants try to dull the significance of *Hutton* by attaching great importance to the court's comments about common offering.

## C.

The parties do not dispute that the Carrollton group Production Payment, like the *Hutton* deal, was an investment of money from which plaintiff was anticipating profits, solely from the efforts of others. However, the defendants sorely contest the applicability of *Hutton* to this case with respect to the second *Howey* factor, the one requiring a common enterprise. The Court's inquiry in determining whether summary judgment is proper on the issue whether the Production Payment is an investment contract, therefore, is limited to the common enterprise construct.

## III.

The Fifth Circuit long ago rejected the strict requirement imposed by some other circuits that there can be no investment contract without "horizontal commonality" (that is, a pooling of investors so that all the investors' fortunes are tied to the others). *See Securities & Exchange Commission v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 478–79 (5 Cir.1974); *Securities & Exchange Commission v. Continental Commodities Corp.,* 497 F.2d 516, 522 (5 Cir.1974); *see also Long v. Schultz Cattle Co.,* 881 F.2d 129, 140 (5 Cir.1989). Rather, in this Circuit, a common enterprise can also exist when there is " 'vertical commonality' between the investors and the promoter." *Id.* (citing *Koscot, supra).* The Circuit has emphasized that what is important is not the "similitude or coincidence of investor input." *Koscot, supra* at 478. Instead, "the critical inquiry is confined to whether the fortuity of the investments ... is essentially dependent on promoter expertise." *Continental Commodities, supra.* As a tenet of economic doctrine, vertical commonality seems no less functionally important than horizontal commonality. It would be clean and simple to be able to say that only public offerings can invoke security status. But that would ignore the reality of the private marketplace. However, can we also say that vertical commonality is at work in the private, one investor-one promoter setting? That has not yet been answered in our circuit.

Defendants stress that there cannot be a "common enterprise" for purposes of

the Securities Acts when there is but one investor and one promoter. Plaintiff counters that vertical commonality can compatibly exist in the setting of a pooling of efforts between one investor and one promoter. At first glance, the one investor-one promoter objection seems too cosmetic, but it merits serious discourse.

Several courts that have spoken to the question have differed in their answers. *Compare Hocking v. Dubois,* 839 F.2d 560, 566 (9 Cir.1988) ("[E]ven a venture that has but a single investor can be a common enterprise if the promoter's remuneration depends on the success of the venture."); *Dooner v. NMI Ltd.,* 725 F.Supp. 153, 159 (S.D.N.Y.1989) ("[V]ertical commonality can exist based on a transaction solely between a promoter and a single investor."); *Huberman v. Denny's Restaurants, Inc.,* 337 F.Supp. 1249, 1251 (N.D.Cal.1972) (whether or not the transaction was an isolated one that involved only one investor was "immaterial" to commonality requirement) *with Sunshine Kitchens v. Alanthus Corp.,* 403 F.Supp. 719, 721–22 (S.D.Fla.1975) (refusing to extend *Koscot* and *Continental Commodities* beyond schemes involving hundreds of investors to transaction involving one investor and one promoter).

Defendants seek the comfort of the Supreme Court's decision in *Marine Bank v. Weaver,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982). However, like the *Dooner* court, this Court does not read *Weaver* defendants' way. *Weaver's* facts are strange, and that is its precedential frailty here.

In *Weaver* the plaintiffs (husband and wife) bought a certificate of deposit from the defendant bank, and immediately pledged it to secure a $65,000 loan the bank had made to Columbus Packing Co. In return, the Columbus owners agreed that the plaintiffs would receive 50% of the firm's net profits and $100 a month for as long as they guaranteed the loan. Further, it was agreed that the plaintiffs, at the discretion of the Columbus owners, could use the Columbus barn and pasture.

The Supreme Court decided that the transaction did not involve a security. Congress, the Court felt, meant for the securities laws "to cover those instruments ordinarily and commonly considered to be securities in the commercial world," and this certainly was not such an instrument. 455 U.S. at 559, 102 S.Ct. at 1225. Other "unusual instruments", however, are also included, the Court said. *Id.* at 556, 102 S.Ct. at 1223. But the Court pointed out that its decisions had applied the securities laws to unusual instruments only when they "involved offers to a number of potential investors, not a private transaction as in this case." *Id.* at 559–60, 102 S.Ct. at 1225 (citing *Howey, supra* (in which forty-two people bought interests in a citrus grove during a four-month period) and *C.M. Joiner Leasing Corp., supra* (where offers to sell oil leases were sent to 1,000 potential buyers)).

The Court also observed that in *Howey* and *C.M. Joiner Leasing* the instruments at issue could have been publicly traded because they had equivalent value to other people. *C.M. Joiner Leasing* had held that a security is a device in which there is "common trading." *C.M. Joiner Leasing, supra,* 320 U.S. at 351, 64 S.Ct. at 123.

The instrument in *Weaver* was thought to be different:

[T]he [owners] of Columbus distributed no prospectus to the [plaintiffs] or to other potential investors, and the unique agreement they negotiated was not designed to be traded publicly. The provision that the [plaintiffs] could use the barn and pastures of the slaughterhouse at the discretion of [Columbus' owners] underscores the unique character of the transaction. Similarly, the provision that the [plaintiffs] could veto future loans gave them a measure of control over the operation of the slaughterhouse not characteristic of a security.

*Id.* 455 U.S. at 560, 102 S.Ct. at 1225. Thus, the Court held that "this unique agreement, negotiated one-on-one by the parties, is not a security." *Weaver, supra,* at 560, 102 S.Ct. at 1225.

At this point, *Weaver* superficially looks like binding precedent, but the Supreme Court added an important element when it stressed that its resolution of *Weaver* did not mean that a "business agreement between transacting parties invariably falls outside the definition of a 'security' as defined by the federal statutes." *Id.* at 560 n. 11, 102 S.Ct. at 1225 n. 11. Instead, the Court said that "[e]ach transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole." *Id.* The case literature defines no bright lines.

*Weaver* clearly does not stand for the argument that numerous investors must be involved, for a contract or transaction to involve a security. Indeed, cases decided since *Weaver* accord with this Court's view that in jurisdictions where vertical commonality is an appropriate test for determining whether common enterprise exists, an arrangement can be a security even if it involves only one investor and one promoter. *See Hocking, supra; Dooner, supra; Department of Economic Development v. Arthur Andersen & Co.*, 683 F.Supp. 1463, 1473 (S.D.N.Y.1988).

*Dooner* presents the most thoughtful discussion of *Weaver's* effect in this context.[4] There, the court considered whether a limited partnership interest was a security. In *Dooner*, the plaintiff bought a limited partnership interest in an existing partnership, and he was the only person to whom an offer of limited partnership was extended.

The court held that the plaintiff had alleged sufficient facts to support his claim that the limited partnership interest was an investment contract. *Id.* at 160. The court rejected the defendant's contention that, under *Weaver*, the plaintiff could not show that the limited partnership interest was a security unless there were "a number of limited partners." *Id.* at 159, n. 5. Pointing specifically to *Weaver's* careful statement that the Court was not saying that a privately negotiated transaction could never involve a security, the *Dooner* court declined to "graft[ ] a strict numerosity requirement onto the definition of an investment contract." *Id.* To do so, the court said, "would unnecessarily conflict with the broad remedial purposes of the security laws and would fail to allow sufficient flexibility to adapt to the 'countless and variable' fraudulent schemes that Congress intended to be covered by the securities laws." *Id.* (citing *Howey, supra,* 328 U.S. at 299, 66 S.Ct. at 1103). In adopting *Dooner's* thinking on the subject, this Court would add that the need for numerosity does not seem to enhance the economic or commercial justification for saying that this model can infer a security arrangement but the one investor-one promoter model can not. The Court is unable to identify a doctrinal underpinning that commands that numerosity requires one result but that the singularity of a transaction, in the security context, demands the contrary.[5]

---

**4.** In describing the commonality requirement, neither *Hocking* nor *Department of Economic Development* address *Weaver.* Further, neither of these cases involved claims of vertical commonality between a single investor and a single promoter. However, in its general review of the law on this subject, *Hocking* noted that the Ninth Circuit had already held that "'vertical commonality requires that the investor and the promoter be involved in some common venture without mandating that other investors also be involved in that venture.'" *Hocking,* 839 F.2d at 566 (quoting *Brodt v. Bache & Co.,* 595 F.2d 459, 461 (9 Cir.1978)).

Similarly, in *Department of Economic Development,* although horizontal commonality existed, the court noted in its review of cases defining vertical commonality that a one-to-one relationship between a single promoter and investor is sufficient "provided that the promoter and the investor share the successes and failures of the venture." *Department of Economic Development, supra.*

**5.** At least one well-known scholar agrees with this Court's conclusion that the doctrinal underpinnings of the securities laws do not support a strict numerosity requirement in the definition of a common enterprise. *See* 2 L. Loss & J. Seligman, *Securities Regulation* 925 (3d ed. 1989). After reviewing the various approaches to the commonality element, Professor Loss concludes:

The Ninth Circuit's approach is the preferable one. It will embrace 'common enterprises' both of a horizontal and of a vertical type whenever some form of profit-sharing can be shown.... [Thus,] when the income of *one*

The Court agrees with *Dooner.* Not only did *Weaver* specifically cramp its holding by recognizing that some privately negotiated transactions could ·be securities, *see Weaver*, 455 U.S. at 560 n. 11, 102 S.Ct. at 1225 n. 11, but it also instructed that courts should look at many different factors when defining whether a transaction involves a security. *Id.* at 556, 102 S.Ct. at 1223. Numerosity is not dispositive. The inquiry focuses, instead, on the totality of the circumstances effecting "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." *Id.* (quotations omitted)

Regarding the specific guarantee agreement at issue in *Weaver*, the Court pointed not only to the fact that the transaction was privately negotiated between single investor and promoter, but also to several other unique aspects of the deal that were certainly "not characteristic of a security." *Id.* at 560, 102 S.Ct. at 1225. Not only was no prospectus ever distributed to the plaintiffs, and the instrument was not designed to be publicly traded, but the plaintiffs could use the barn and pastures, and the plaintiffs retained some measure of control over the success of the venture since they could veto future loans to Columbus. *Id.*

This Court, therefore, agrees with the post-*Weaver* decisions that have held that there can be a common enterprise, a necessary ingredient to the definition of an investment contract, even if there is only one promoter and one investor, as long as the promoter and investor share in the successes and failures of the venture through the efforts and skills of one other than the investor. *See also Koscot*, 497 F.2d at 478 (" '[a] common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties.' " (quoting *Securities & Exchange Commission v. Glenn W. Turn-*

*er Enterprises, Inc.*, 474 F.2d 476, 482 n. 7 (9 Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973)); *Continental Commodities*, 497 F.2d at 522).

The Court concludes that plaintiff has sufficiently alleged that the Production Payment implicates the requirement of common enterprise. The parties agree that under the investment arrangement, plaintiff would receive, out of the proceeds of the production of the two wells, its principal and a fixed rate of return on the unpaid principal. Once the principal was fully repaid with interest, plaintiff would then receive a 15% ownership interest in the Carrollton group's working interest in the mineral leases.

Thus, it appears that the plaintiff's fortunes (whether the principal is ever repaid, whether the interest is paid, whether plaintiff ever obtains the 15% share of the Carrollton group's interest, and whether the value of that interest can be identified) were inextricably tied to the Carrollton group's efforts. *See Koscot, supra.* Indeed, whether the transaction at issue in this case was a good investment for plaintiff certainly depended in large measure on the Carrollton group's expertise in running the well operations. *See Continental Commodities, supra* ("[T]he critical inquiry is confined to whether the fortuity of the investments ... is essentially dependent upon promoter expertise."). Given the Court's resolution of the common enterprise issue, this case seems indistinguishable from *Hutton*, and this motion is DENIED.[6]

*investor and one promoter* was each dependent upon the profits of an undertaking, there would be a common enterprise.
*Id.* (footnote omitted) (emphasis supplied).

6. It seems plausible, although not before the Court now, that plaintiff might even be entitled to summary relief on this issue.